504 F.2d 168
 SIOUX VALLEY EMPIRE ELECTRIC ASSOCIATION, INC., Appellee,
v.
Earl L. BUTZ, Secretary of Agriculture, and David A. Hamil,
Administrator of Rural Electrification
Administration, Appellants.
 No. 74-1171.
 United States Court of Appeals, Eighth Circuit.
 Submitted June 13, 1974.
Decided Sept. 26, 1974.
 
 David M. Cohen, Atty., Dept. of Justice, Washington, D.C., for appellants.
 Alan F. Glover, Brookings, S.D., for appellee.
 Before GIBSON, Chief Judge, and BRIGHT and WEBSTER, Circuit Judges.
 GIBSON, Chief Judge.
 
 
 1
 Defendants Earl L. Butz, Secretary of Agriculture, and David A. Hamil, Administrator of the Rural Electrification Administration, appeal from a summary judgment entered for the plaintiff, Sioux Valley Empire Electric Association, Inc., and the denial of a summary judgment in their favor.[1] At issue is whether the Administrator[2] had the discretion to terminate two percent direct loans under the Rural Electrification Act of 1936, 7 U.S.C. 901 et seq.,[3] and to substitute five percent insured and guaranteed loans under the Rural Development Act of 1972. 7 U.S.C. 1926 et seq. We affirm the District Court's holding that Congress did not grant the Administrator the discretion to terminate the two percent direct loans under the Rural Electrification Act of 1936 (REA of 1936).
 
 
 2
 Preliminarily, the Administrator does not dispute that plaintiff is entitled to approval of a two percent direct loan under the REA of 1936 if the legal issues here are resolved in plaintiff's favor. In fact, plaintiff has received a two percent loan, which, as the parties have stipulated, will be switched to a five percent loan if defendants prevail here. Therefore, we affirm the District Court's granting of summary judgment for plaintiff without the necessity to remand for consideration of factual issues.
 
 
 3
 Plaintiff, a rural electric cooperative chartered in South Dakota and located in Colman, South Dakota, submitted an application for a two percent $599,000 direct loan under the REA of 1936 to the Administrator of Rural Electrification on November 26, 1972. These two percent direct loans under the REA of 1936 have been commonly referred to as Section 4 loans. 7 U.S.C. 904. While Sioux Valley's application was pending before the agency, the Department of Agriculture released the following statement to the press:
 
 
 4
 RURAL ELECTRIC AND RURAL TELEPHONE LOAN PROGRAMS CHANGE:
 
 
 5
 WASHINGTON, Dec. 29 (,1972)-- The U.S. Department of Agriculture announced today that the REA electric and telephone 2 percent direct loan programs are being converted to insured and guaranteed loan programs at somewhat higher interest rates effective Jan. 1, 1973. This action was made possible by the enactment of the Rural Development Act of 1972 in which the Congress provided very broad authorities to make guaranteed and insured loans to finance all types of community development programs.
 
 
 6
 This change is part of the effort to hold 1973 Federal budget outlays to $250 billion and keep the outstanding public debt within the statutory limit of $465 billion through June 30, 1973. It will eliminate direct Federal loans and substitute credit from private sources at interest rates that are more in line with the cost of money on today's market. Insured and guaranteed loans will reduce the impact on the Federal budget and the public debt and are designed to facilitate more rapid growth in the credit programs being provided by the National Rural Utilities Cooperative Finance Corporation, the Rural Telephone Bank and other private lenders.
 
 
 7
 Beginning on Jan. 1, 1973, all REA loans will be made as guaranteed and insured loans under the authority of Section 104 of the Rural Development Act of 1972 (Section 306(a)(1) of the Consolidated Farm and Rural Development Act). In order to meet more fully the needs of REA borrowers, an additional $200 million in loan authority will be made available over and above current allocations. This will provide a total loan authority of $618 million for rural electric loans and $145 million for rural telephone loans in fiscal year 1973. These funds are in addition to those loans available to REA borrowers from private sources, including CFC.
 
 
 8
 Loans to electric and telephone cooperatives will be made on an insured basis at 5 percent interest (guaranteed loans will also be available to electric cooperatives where private capital is available on advantageous terms). Loans to commercial power companies and commercial telephone companies will be guaranteed at market rates of interest.
 
 
 9
 Many details of this transition from the authorities of the Rural Electrification Act of 1936, as amended to the authorities of the Rural Development Act will require time to work out. Borrowers and other interested parties will be advised of the necessary changes in loan requirements and loan processing as repidly as possible. Every effort will be made to expedite new programs in order to meet the expanding needs of REA borrowers.
 
 
 10
 Sioux Valley did not apply to convert its pending application for an REA direct loan to an insured and guaranteed RDA loan.
 
 
 11
 On March 6, 1973, Sioux Valley filed this action, seeking to compel the Secretary and the Administrator to loan funds to it under the REA of 1936. The essence of plaintiff's suit is its desire to obtain the loan at a two percent, rather than five percent, annual interest rate.
 
 
 12
 The Government advances these arguments on appeal: (a) the action of the Administrator in denying Sioux Valley's application for a Section 4 loan is not subject to judicial review since that action is wholly committed to agency discretion by law; (b) the Administrator possessed the discretion to convert Section 4 loans under the REA of 1936 to RDA insured and guaranteed loans; (c) the Administrator reasonably exercised his discretion in denying Sioux Valley's Section 4 loan in order to maintain federal expenditures below $250 billion, to help curb inflation, and to provide for greater loan moneys for all rural cooperatives under the RDA.
 
 
 13
 The parties do not address themselves to the justiciable issues inherent in this type of case involving the withholding or termination of appropriated funds. The counsel for the Administrator during oral argument on appeal expressly said that the termination of this REA program was not an impoundment of appropriated funds. Apparently the Administrator's rationale is based on the position that no funds were actually withheld since more loan moneys were potentially available for rural electrification under the RDA than supposedly would have been available under the REA of 1936. He also argues here that this case involves only a statutory interpretation and not constitutional issues. The fact is that no REA funds were loaned from January 1, 1973, through May 11, 1973. Also, the Administrator only spent $228 million of the $595 million appropriated for REA loans from July 1, 1972, through December 31, 1972. No loans under the REA of 1936 were made subsequent to May 11, 1973, the effective date for another amendment to the REA creating two and five percent insured loans. 7 U.S.C. 935(b). All pending applications for Section 4 loans under the REA of 1936 could be converted to RDA loans; however, that later act has stricter requirements for qualification, and it is conceivable that fewer loan approvals under the RDA would have been possible. The parties provide us with no data concerning loans for rural electrification under the RDA program. Nevertheless, the funds for the lower interest rate Section 4 loans were terminated by the Administrator's decision. The fact that moneys were available under a different program with different qualifying requirements does not negate the fact that funds were terminated under the REA program. It cannot logically be maintained that the Section 4 loan program was not terminated since other loan moneys were available in another program at a higher interest rate.[4]
 
 
 14
 Although the Administrator during oral argument on appeal maintained that this case is not an impoundment case with its attendant justiciable issues, apparently his view has changed from his arguments presented before the District Court. There, the Administrator argued that this case was not justiciable due to the following theories: (a) the Government has not consented to be sued and sovereign immunity therefore bars federal question jurisdiction; (b) the political question doctrine prevents a judicial consideration of this case; and (c) the President of the United States has the authority to impound funds under Article II, 1 of the Constitution. These arguments concerning justiciability advanced before the District Court are the same arguments advanced in other sases conceded by other government officials to involve constitutional issues concerning executive impoundment of Congressionally appropriated funds. In State of Minnesota v. United States Environmental Protection Agency, No. 73-1446 (8th Cir., en banc, submitted February 13, 1974),[5] the Government has raised the political question doctrine (the lack of judicially manageable standards) under Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). In Campaign Clean Water, Inc. v. Train, 489 F.2d 492 (4th Cir. 1973), cert. granted, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 557 (1974), and New York City v. Train, 494 E.2d 1033 (D.C.Cir. 1974), cert. granted sub nom. Train v. City of New York, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 557 (1974), Government counsel has raised the sovereign immunity argument. Apparently not only is impoundment a seed that generates many theories, but one that may be planted in all seasons and in the varying locales of our federal operations. Although the Administrator does not argue the justiciable issues here, this court must face such questions involving jurisdiction. No citation of authority is necessary for the elementary proposition that this court must satisfy itself that jurisdiction adheres before considering the merits of the case.
 
 
 15
 The Administrator does argue that judicial review is precluded because the action of the Administrator was committed wholly to his administrative discretion. Panama Canal Co. v. Grace Line, Inc., 356 U.S. 309, 78 S.Ct. 752, 2 L.Ed.2d 788 (1958). The Administrator contends that the very nature of economic judgments concerning the budget and government funding makes the issue of the termination of the REA program and the substitution of the RDA program one inappropriate for judicial review and therefore wholly committed to agency discretion. In State of Minnesota, supra, before this court en banc, the Government argues that the same economic judgments in the same fiscal year concerning government funding make that case appropriate for application of the political question doctrine. We fail to understand why the Government argues the agency discretion argument in this case without also, or instead, arguing the political question doctrine advanced in State of Minnesota and before the District Court in this case.
 
 
 16
 We only briefly deal with the justiciable issues here, for in our view State Highway Commission of Missouri v. Volpe, 479 F.2d 1099, 1106 (8th Cir. 1973) (hereinafter Volpe), indicates that this court will review cases involving withholding or termination of appropriated funds when 'the only issue before * * * (the) court is the question of statutory construction.' In such a case, there is a 'justiciable issue capable of judicial resolution.' Volpe, supra at 1107. In Volpe, this court rejected the Secretary's arguments that the political question doctrine precluded review[6] and that the Anti-Deficiency Act, 31 U.S.C. 655(c), allowed the termination of appropriations for highways. Volpe, supra at 1118.
 
 
 17
 Volpe's rationale applies to this case. We must determine whether the REA of 1936, the RDA of 1972, the REA amendment of 1973 (7 U.S.C. 901 et seq., Pub.L. 93-32, effective May 11, 1973), permitted the Administrator the discretion to terminate the REA's Section 4 two percent direct loan program. The question involved is one of statutory interpretation and the issue, as held in Volpe, is justiciable. The argument that the Administrator's action was wholly committed to agency discretion is directly at odds with Volpe's statement that statutory construction is within the province of the courts. Also, there is 'law to apply,' the statutory construction of the relevant acts, and therefore the Administrator's action was not wholly 'committed to agency discretion by law.' Ratnayake v. Mack, 499 F.2d 1207, 1210 (8th Cir. 1974). Further, as in Volpe, federal question jurisdiction adheres pursuant to 28 U.S.C. 1331(a).[7]
 
 
 18
 The Administrator argues that Volpe is inapplicable to this case involving the REA of 1936, since the Federal Highway Act, 23 U.S.C. 101 et seq., contains detailed standards guiding the Secretary of Transportation's discretion in the obligation of highway funds to the states. The argument fails to appreciate that Volpe contained general standards of analysis concerning how statutes are to be analyzed in relation to an executive withholding of Congressionally appropriated funds. Also, it is true that Volpe involved the Federal Highway Act, which contained a provision, 23 U.S.C. 101(c), that, according to the Government, 'appeared to have been enacted for the express purpose of preventing impoundment as an anti-inflationary measure.' Although there is not a provision similar to 23 U.S.C. 101(c) in the REA of 1936, Volpe's whole method of statutory analysis should not be disregarded in this case. The existence of 23 U.S.C. 101(c) only provided this court with an additional reason for its finding. We think Volpe controls and is directly in point.
 
 
 19
 Before discussing the various acts and relevant legislative history involved in this case, an understanding of Volpe as it applies to this case will establish the method of statutory analysis to be used. Volpe first held that a review of the statute itself reveals the latitude of discretion that is vested in the officials involved. Volpe, supra, at 1109. Second, Volpe said that Article I, 8 of the Constitution delegates to the Congress the power 'to make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, vested by this Constitution in the Government of the United States, or in any Department or Office thereof'; that Congress is the only branch of Government that can dictate the terms of those laws; and that 'the Secretary's authority is limited to carrying out the law according to its terms.' Volpe, supra at 1111.
 
 
 20
 Next, Volpe discussed a general approach to statutory construction. Volpe, supra at 1111-1114. According to Volpe, this court must determine the legislative intention in the questional act by looking to the whole scope of the statute to be construed. Also, the failure of the act to include a provision that explicitly or implicitly allows withholding of appropriated funds for purposes unrelated to achieving the goals of the act is strong evidence that Congress did not intend to grant that power to the Secretary or his representatives. Volpe, supra at 1114. Further, subsequent legislation that declares 'the intent of an earlier statute is entitled to great weight in statutory construction.' Volpe, supra at 1116, quoting Red Lion Broadcasting Co. v. Federal Communications Commission, 395 U.S. 367, 380-381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). This last standard is particularly relevant in this case, since the legislative history of the REA amendment of 1973 clearly reveals Congressional intentions in enacting the REA of 1936 and the RDA of 1972.
 
 
 21
 With these principles in mind, we look to the REA of 1936, the RDA of 1972, and the REA amendment of 1973 to determine if those acts and Congress' intention as revealed also in the legislative history allowed the Administrator the discretion to terminate the Section 4 loans and to substitute the RDA insured loans in their place. The REA amendment of 1973 and its legislative history gives us a subsequent act interpreting the legislative intention of the REA of 1936 and the RDA of 1972.
 
 
 22
 The Rural Electrification Administration, originally established on May 11, 1935, by Executive Order No. 7037 pursuant to the Emergency Relief Act of 1935,[8] became a statutory agency when Congress enacted the REA of 1936. 7 U.S.C. 901 et seq. Congress was interested originally in providing for a ten-year program to bring rural electrification to one million more farmers,[9] in equalizing the standard of living of rural areas as compared to urban areas,[10] and in asserting federal government leadership into the financing of electrification as opposed to private financiers and utilities, termed the power trust, that were exacting 'tribute' from the farmers for electrical service.[11] The whole scope of the original Act was to provide for direct loans for rural electrification, telephones, and plumbing. 7 U.S.C. 901, 902, 904, 905, and 922.[12]
 
 
 23
 The Administrator makes one specific argument concerning the REA of 1936. He argues that the REA of 1936 'authorized and empowered'[13] the Administrator to make the loans, but does not compel him to do so. He further contends that the Act would have authorized and directed[14] loans to be made if loans had to be made. The Administrator factually emphasizes that in fiscal 1972, the year before the activity involved in this case, the Administrator did not loan $107 million of the $545 million appropriated and that 'Congress merely added the $107 million to the appropriation for the next fiscal year without directing their expenditure.'[15]
 
 
 24
 In support of his position that no REA Section 4 loans need be made each year despite appropriations for that purpose, the Administrator directs us to a statement made by Representative Merritt in 1936: 'There is no compulsion on this autocrat to make any grants at all.' That statement, however, is taken out of context. The relevant portion of the statement reads:
 
 
 25
 The bill provides that of this first $50,000,000 and the subsequent allowances of $40,000,000 a year, 50 percent must be allocated to the various States in proportion that their unelectrified farms bear to the unelectrified farms of other States. But here is a provision which I think the House ought to know about. There is no compulsion on this autocrat (the Administrator) to make any grants at all. He may allocate, but any money that is not expended in any one year goes into a general fund which has no limitations whatever. The other 50 percent is without any limitation to start with. The only provision is that not over 10 percent shall be allowed to be used in any one State.
 
 
 26
 I do not say that the Administrator will do this, but it is possible under this bill for him not to use any money, if he wants to build up a fund. This will go over to the next year and will not be subject to any restrictions at all. Then he may use all of his fund if he wants to in only 10 States. I do not say he will do that, but he may.
 
 
 27
 80 Cong.Rec. 5278 (1936) (remarks of Representative Merritt).
 
 
 28
 In context, the statement lends an entirely different conclusion. Representative Merritt was saying that the Administrator had no compulsion to make any loans under the Act's provision relating to the restrictive allocation between the states based on the number of unelectrified farms. Any amount left over went into a general fund. The bill as passed called for a ten-year program with funding of $50 million for each of the first two years and $40 million for each of the last eight years for a total of $420 million. Act of May 20, 1936, Pub.L. No. 74-605 3(a) and (b), 49 Stat. 1364; 80 Cong.Rec. 5313 (1936); 80 Cong.Rec. 5281 (1936) (remarks of Representative Rayburn).
 
 
 29
 We think the legislative history of the original REA of 1936 contemplated that the appropriation of $420 million would be expended in its entirety, although the Administrator did have the discretion to withhold funds from the restrictive program and allow that money to enter the general fund. He also had the discretion to carry forward funds not expended in one fiscal year to the next fiscal year. 3(e), 49 Stat. 1364. However, the Act itself indicates an express desire to expend the appropriated amount of $420 million over ten years. In our view the Administrator under the original REA of 1936 was not given the discretion to terminate all appropriations and the entire program. In this regard, the REA of 1936 has not been amended, and the Administrator in 1973 similarly did not have the discretion to terminate the entire Section 4 program.
 
 
 30
 We do agree with the Government that 'authorize and direct' involves a mandatory commandment, whereas 'authorize and empower' involves a discretionary authority. However, the REA of 1936 did not give the Administrator the discretion to terminate the program.[16]
 
 
 31
 The Administrator further argues taht the RDA of 1972 allowed him the discretion to terminate the Section 4 direct loan program under the REA of 1936 and to convert these loans to RDA insured loans. Administrator Hamil announced this unexpected policy in his December 29, 1972, press release. The Administrator has consistently argued that he could convert Section 4 loans to RDA loans due to the following language in the RDA:
 
 
 32
 The Secretary is also authorized to make or insure loans * * * to provide for the application or establishment of * * * essential community facilities * * *.
 
 
 33
 7 U.S.C. 1926(a)(1).
 
 
 34
 In the Administrator's opinion, rural electrification is an essential 'community facility' under the RDA. The Administrator's view is more fully explained in a legal memorandum to him of February 2, 1973:[17]
 
 
 35
 While Congress did not specifically indicate that rural electric or telephone systems were to be considered as 'essential community facilities' * * * for the purpose of making loans under this Section, it would appear that such systems are 'needed for the orderly development of a rural community', a stated purpose of the Section, and are commonly understood to be 'essential community facilities'. Therefore, it is concluded that Sec. 306(a)(1) does authorize certain loans to be made pursuant to its terms for rural electric and reral telephone services.
 
 
 36
 119 Cong.Rec. 2919 (Feb. 20, 1973) (Exhibit 1, Memorandum from R. Stanley Harsh, Assistant General Counsel for Rural Development and Conservation, to Administrator Hamil).
 
 
 37
 The Administrator's interpretation of 'community facilities' and its conversion of REA to RDA loans is an ingenious display of legal reasoning; it however lacks one essential ingredient, any indication of Congressional approval. Nowhere in the legislative history of the RDA do we find any statement, express or otherwise, that Congress intended that community facilities would include rural electrification.
 
 
 38
 The REA amendment of 1973 (Pub.L. 93-32, effective May 11, 1973) and the legislative history of that amendment supports our conclusion. We accord great weight to this later legislation and the legislative history declaring the intention of Congress in enacting the RDA. Volpe, supra, at 1116. Extended discussion of this amendment in Congress reveals an outrage over the termination of the REA program.
 
 
 39
 The Senate on February 21, 1973, originally considered and passed Senate Bill 394, with the mandatory language of directing, instead of authorizing and empowering, the Administrator to make loans each fiscal year in the full amount of appropriations made by Congress. 119 Cong.Rec. 3087 (Feb. 21, 1973). In discussing S. 394, several senators expressed alarm in various degrees over executive usurpation of legislative power in terminating the Section 4 loan program. Senator Dole, a cosponsor of the bill, although concerned with the low two percent interest rate, said that the REA was 'a necessary program and a worthwhile program and one that should be continued.' 119 Cong.Rec. 2929 (Feb. 20, 1973) (remarks of Senator Dole). Senator Humphrey said that the 'Rural Development Act of 1972 was clearly not intended by Congress as a substitute for the Rural Electrification Act of 1936' and that 'it (the RDA) implied no authority to terminate the Rural Electrification Act loan program.' 119 Cong.Rec. 2917 (Feb. 20, 1973). He further stated:
 
 
 40
 It is the Congress' duty to dispose. It is the President's duty to propose. In this case the President has proposed and disposed.
 
 119 Cong.Rec. 2923 (Feb. 20, 1973).[18]
 
 41
 Senator Humphrey was not alone in his outrage. Senator McGovern characterized the issue as 'whether or not the administration believes in law and order,' the law being the REA of 1936. 119 Cong.Rec. 2927 (Feb. 20, 1973).[19] Senator McGovern said that the 'issue is whether the administration has a constitutional and legal right to terminate, at whim, a program created by an act of Congress.' 119 Cong.Rec. 2927 (Feb. 20, 1973). Senator McGovern appealed to the administration that 'our subcommittee (on Agricultural Credit and Rural Electrification) is willing, able, and eager to work with the administration, or any other party' for any changes needed in the REA. 119 Cong.Rec. 2927 (Feb. 20, 1973). Senator Mondale said taht the termination of the REA program and other executive actions in fiscal 1973 posed 'a grave threat to the integrity of our laws and to the systems of checks and balances against the abuse of power as provided in the Constitution.' 119 Cong.Rec. 3076 (Feb. 21, 1973).
 
 
 42
 Other comments support the above-described indignation. Senator Aiken said that 'the President or the administration was wrong in basing its decision to raise the interest rate by using the Rural Development Act of 1972 which was not intended for any such purpose at all.' 119 Cong.Rec. 3080 (Feb. 21, 1973). The House Committee on Agriculture said that 'the Rural Development Act was not designed for that purpose (rural electrification and telephone needs) and was never intended by the Congress to be used in such fashion.' H.Rep. No. 91, 1 U.S.Code Cong. & Admin.News, pp. 1365, 1367, 93rd Cong.1st Sess. (1973). Representative Poage said that the Administrator had 'ruthlessly abused' his discretion in terminating the REA program. 119 Cong.Rec. 2410 (April 4, 1973).
 
 
 43
 Our reading of the legislative history of the REA amendment of 1973 shows no support for the termination of the REA program, although there was a concern over the low interest rates and the mandatory language of the original Senate Bill (S. 394) and the House Bill (H.R. 2424). 119 Cong.Rec. 2406 (April 4, 1973) (remarks of Representative Martin). The House Bill, H.R. 2424, was passed on April 4, 1973, also with the mandatory language. 119 Cong.Rec. 2424 (April 4, 1973). The two bills were subsequently considered by a Conference Committee.
 
 
 44
 The Administration objected strongly to the mandatory language appearing identically in both the Senate and House bills, which directed the Secretary to expend all appropriated funds in each fiscal year. Statement of Hon. J. Phil Cambell, Undersecretary of Agriculture, 1 U.S. Code Cong. & Admin.News, pp. 1365, 1369, 93rd Cong. 1st Sess. (1973). The Conference Committee, composed of senators and representatives, met to reconcile certain provisions of the Senate and House bills. As pertinent to this case, the Committee recommended the deletion of the mandatory language and the processing of five and two percent insured loans under the Rural Electrification Agency. The Committee specifically said that it was deleting the mandatory language due to the following letter from the Secretary:
 
 
 45
 Department of Agriculture,
 
 
 46
 Washington, D.C., May 8, 1973. Hon. W. R. Poage Chairman, House Committee on Agriculture, Washington, D.C.
 
 
 47
 Dear Bob: I am pleased to provide you and the members of the conference committee the Administration's position on the REA financing bill now in conference, S. 394. As I told you during our meeting in your office last Thursday, speaking for the Administration, we can assure you that during each of the next three yrars an REA program at levels not less than budgeted for Fiscal Year 1974 will be operated through the REA under the authority of S. 394 as finally passed and that not less than $105 million-- $80 million for the electric program and $25 million for the telephone loan program (of new loans)-- will be made available at the 2% Rate.
 
 
 48
 This commitment is conditioned on but one cardinal principle-- mandatory language relating to criteria in Section 305 be stricken from the legislation. Further, there will be no legislative direction with respect to hardship cases beyond the criteria set forth in the House-- passed bill. As you know, the Secretary would, of course, have authority to exceed this minimum level for 2% Loans.
 
 
 49
 On behalf of the Administration and every American, I want to thank you and the conferees for your efforts to achieve constructive legislation which will ensure a viable rural electric and telephone system.
 
 
 50
 Sincerely, Earl L. Butz, Secretary.
 
 
 51
 Conf.Rep. No. 169, 1 U.S.Code Cong. & Admin.News, pp. 1388, 1389-90, 93rd Cong., 1st Sess. (1973); also reprinted at 119 CongRec. 8609 (May 9, 1973).
 
 
 52
 Both the Senate and House agreed to the Committee's recommendations, and S. 394 was enacted with the changes approved by the Conference Committee. The mandatory language was deleted. Most Senators and Representatives agreed to the new bill as a compromise or a fair resolution of the controversy. The Senate Bill with the Conference Committee's changes was passed by Congress, but with the express understanding that the Administrator had no discretion to alter the commitments made in Secretary Butz's letter of May 8, 1973.[20]
 
 
 53
 We summarize the above statutory interpretation and legislative history. First, the REA of 1936 did not authorize the Administrator to terminate the entire Section 4 loan program. In reviewing the statute itself, we find no provision that indicates such an authority. Subsequent amendments to the REA of 1936 likewise added no such discretion. The whole scope of the REA of 1936 indicates a Congressional intention to fund, inter alia, rural electrification under the Section 4 direct loan program. Termination of the program itself obviously could not carry out this goal. Also, there is no provision in the REA of 1936 that allows the Administrator to terminate the program for reasons unrelated to achieving the goals of the Act. As in Volpe, that failure to include such a provision is strong evidence that Congress did not intend to grant such discretion to the Administrator. Volpe, supra at 1114.
 
 
 54
 Second, the RDA of 1972 provides no support that it was ever intended to be used as a substitute for rural electrification. Further, there is no statutory support or legislative history in the RDA to indicate that rural electrification is a community facility under 7 U.S.C. 1926.
 
 
 55
 Sioux Valley, therefore, was entitled to summary judgment. One further comment on the interpretation of the REA amendment of 1973 should be made in order to clarify what was not presented in this case. Sioux Valley had a pending application under the REA of 1936 before it was amended on May 11, 1973. For any loan applications made after May 11, 1973, Congress intended that the REA as amended on May 11, 1973, should apply. The amendment of 1973 represents a political settlement of the differences between the Administrator and the Congress over the operation and direction of the Rural Electrification Program, and thus would control the terms and conditions of any loan applications made after its effective date. Representative Teague stated the Congressional intention clearly:
 
 
 56
 While this conference report does not change the direct loan authority in the existing act, it would be inconceivable to me, and I assume to the other conferees and the administration, that the old direct loan program be revived and restored (the Section 4 program under the REA of 1936). It certainly is not my intent to do so, and I strongly urge that in the days and years ahead the needed rural electric and rural telephone financing be done through the insured and guaranteed loan structure provided by this legislation.
 
 
 57
 119 Cong.Rec. 3546 (May 10, 1973) (remarks of Representative Teague).
 
 
 58
 The District Court's granting of summary judgment for plaintiff is affirmed.
 
 
 
 [1]
 The Honorable Fred J. Nichol, Chief Judge, United States District Court of South Dakota, filed an unpublished Memorandum Decision on November 29, 1973
 
 
 [2]
 For convenience, we shall herein refer to the actions of the Secretary and Administrator as actions of the Administrator. The Secretary has delegated his authority to the Administrator. 38 Fed.Reg. 3951
 
 
 [3]
 The REA of 1936 has been amended several times since 1936. Herein we shall refer to that original act as the REA of 1936. The pertinent amendment in this case was effective on May 11, 1973, and herein we shall refer to that amendment as the REA amendment of 1973
 
 
 [4]
 See Note, 86 Harv.L.Rev. 1505, 1521 n. 88 (1973) (discussion of impoundment during fiscal 1973 and reference to the REA)
 
 
 [5]
 That case is presently under consideration by this court en banc
 
 
 [6]
 Volpe, supra at 1106
 
 
 [7]
 Finding jurisdiction under 28 U.S.C. 1331(a), it is unnecessary to inquire further into other jurisdictional bases alleged in plaintiff's complaint
 
 
 [8]
 Reprinted at 80 Cong.Rec. 5281 (1936)
 
 
 [9]
 80 Cong.Rec. 5273 (remarks of Representative O'Connor). In 1936 only 800,000 of 68,800,000 farms had electricity. 80 Cong.Rec. 5273 (remarks of Representative O'Connor)
 
 
 [10]
 80 Cong.Rec. 5273 (1936) (remarks of Representative Miller)
 
 
 [11]
 80 Cong.Rec. 5274 (1936) (remarks of Representative Miller)
 
 
 [12]
 The interest rates charged by the REA have varied since 1936. The original REA of 1936 provided for an interest rate of three percent and a self-liquidating loan of 25 years. 7 U.S.C. 903. A september 21, 1944, amendment to 903 and 904 changed the interest rate to one and three-quarters percent and the self-liquidating period from 25 to 35 years. A two percent rate was effective at the time that Sioux Valley filed this suit. 7 U.S.C. 904. Representative Rayburn made this comment during debates on the floor and before passage of the REA of 1936:
 We do not want the Federal Government to lend money to any organization, to any corporation, or to any agency of the Government at less a figure than the Government can go out and borrow the money itself.
 
 
 [80]
 Cong.Rec. 5282 (1936) (remarks of Representative Rayburn)
 The three percent rate in the REA of 1936 demonstrated this intention. Apparently, subsequent Congresses-- who have lowered the rate of interest under the Act over the last four decades of generally increasing, and lately steeply increasing, interest rates-- have followed a different rationale and attitude for governmental participation in financing this program. The REA amendment of 1973 does establish a five percent rate, which we are sure still compares much more favorably for the electrical cooperatives to the market rate today compared to the three percent in 1936.
 
 
 [13]
 7 U.S.C. 902, 904, 905, and 922
 
 
 [14]
 The REA of 1936 authorizes and directs the Reconstruction Financing Corporation (since 1948, the Secretary of the Treasury) to make loans to the Administrator in the amount that Congress has appropriated for the fiscal year. 7 U.S.C. 903(a)
 
 
 [15]
 See H.Rep.No.1175, 92d Cong., 2d Sess. 48; S.Rep.No.983, 92d Cong., 2d Sess. 27; H.Rep.No.1283, 92d Cong., 2d Sess
 
 
 [16]
 In holding under the undisputed facts of this case that the Administrator had no discretion to terminate the program, we do not find it necessary to decide, nor do we intimate, whether the Administrator, in administering a program, may within the range of his discretion consider political or economic factors not expressly set forth in the statute itself. Cf. Campaign Clean Water, Inc. v. Train, 489 F.2d 492 (4th Cir. 1973), cert. granted, 416 U.S. 969. 94 S.Ct. 1991, 40 L.Ed.2d 557 (1974). Compare State Highway Commission of Missouri v. Volpe, 479 F.2d 1099, 1114 (8th Cir. 1973)
 
 
 [17]
 The termination of the Section 4 program occurred on January 1, 1973; Administrator Hamil requested this interagency legal memorandum on January 8, 1973; and the memorandum was given to the Administrator on February 2, 1973. It is a questionable procedure to terminate a program and then to request staff legal advice concerning the legality of the termination
 
 
 [18]
 See also 119 Cong.Rec. 3074-75 (Feb. 21, 1973) for further remarks of Senator Humphrey
 
 
 [19]
 Senator McGovern refers to an example of the Basin Electric Power Cooperative in Bismarck, North Dakota, whose loan was terminated. 119 Cong.Rec. 2927. Sioux Valley attempted to raise Basin's claims in this suit, but those claims were dismissed by the District Court due to lack of standing. Sioux Valley does not appeal that holding
 
 
 [20]
 E.g., 119 Cong.Rec. 3546 (May 10, 1973) (remarks of Representative Teague) ('I see no reason the Administrator need use his discretionary power to reach the stipulated amount.'); 119 Cong.Rec. 8609 (May 9, 1973) (remarks of Senator McGovern) ('assurance of the Secretary of Agriculture' for certain levels of funding); 119 Cong.Rec. 8610 (May 9, 1973) (remarks of Senator Dole) ('commitment' by Secretary as indicated in the letter to the Committee)