INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, et al.

v.

Raymond J. DONOVAN, Secretary of the United States Department of Labor, Appellant.

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, et al., Appellants,

v.

Raymond J. DONOVAN, Secretary of the United States Department of Labor.

Nos. 83–1918, 83–2082.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 25, 1984.

Decided Oct. 23, 1984.

Linda Jan S. Pack, Atty., Dept. of Justice, Washington, D.C., with whom Richard K. Willard, Acting Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., and William Kanter, Atty., Dept. of Justice, Washington, D.C., were on the brief, for Donovan, Secretary of the U.S. Dept. of Labor, appellant in No. 83–1918 and cross-appellee in No. 83–2082.

Michael Rubin, San Francisco, Cal., with whom Leonard Page, Detroit, Mich., Stephen P. Berzon, San Francisco, Cal., and Wendy Kahn, Washington, D.C., were on the brief, for Intern. Union, United Auto., Aerospace & Agricultural Implement Workers of America, et al., appellees in No. 83–1918 and cross-appellants in No. 83–2082. A.L. Zwerdling and Stephen I. Schlossburg, Washington, D.C., also entered appearances for Intern. Union, United Auto., Aerospace & Agricultural Implement Workers of America.

Before SCALIA and STARR, Circuit Judges, and GESELL,[*] District Judge of the United States District Court for the District of Columbia.

Opinion for the Court filed by Circuit Judge SCALIA.

SCALIA, Circuit Judge:

This case presents two issues pertaining to retraining benefits for workers adversely affected by foreign competition, provided by the Trade Act of 1974: whether, when Congress provided a $3.7 billion lump-sum appropriation to the Department of Labor's Employment and Training Administration, "for expenses necessary to carry into effect" the Trade Act training program and four other programs, the Secretary of Labor's decision not to allocate any of that amount to the Trade Act training program is judicially reviewable; and whether the Secretary's approval of training under the original version of the 1974 Act, which conferred no rights to compensation for training costs, was effective as the requisite approval under the 1981 amendments which did confer such rights.

---

[*] Sitting by designation pursuant to 28 U.S.C. § 292(a).

## I

The Trade Adjustment Assistance ("Trade Act") Program was created by the Trade Expansion Act of 1962, Pub.L. No. 87–794, 76 Stat. 872, for the purpose of providing benefits to workers and companies adversely affected by competition from foreign imports. The program was substantially expanded and revised by the Trade Act of 1974, Pub.L. No. 93–618, 88 Stat.1978. The principal benefits provided to workers are trade readjustment allowances ("TRAs"), which supplement state unemployment insurance benefits. *See* 19 U.S.C. §§ 2291–92, 2294 (1982); S.Rep. No. 1298, 93d Cong., 2d Sess. 131, 135–36 (1974), 1974 U.S.Code Cong. & Admin.News 1974, 7186, 7273, 7277–7278.

In 1981, as part of the Omnibus Budget Reconciliation Act ("OBRA"), Pub.L. No. 97–35, 95 Stat. 881, Congress enacted major amendments to the Trade Act of 1974, one aspect of which is the subject of the present litigation. Under the 1974 Act, the Secretary could approve training for a worker when he determined that:

there is no suitable employment available . . ., but that suitable employment (which may include technical and professional employment) would be available if the worker received appropriate training. . . .

19 U.S.C. § 2296(a) (1976). Although the Secretary was authorized under this section either to "provide" or "assure" the training (authority which he retains under the existing statute, *see* 19 U.S.C. § 2296(a)(1) (1982)), he was not required to do so, nor was he authorized to reimburse the worker for costs of approved retraining which the worker himself incurred. The incentive for retraining was 26 weeks of "extended" TRAs (beyond the 52 weeks generally available) payable to workers enrolled in approved programs. 19 U.S.C. § 2293(a)(3) (1976). If a worker refused, without good cause, to accept or continue, or failed to make satisfactory progress in, training to which he had been referred by the Secretary under this provision, he lost his entitlement to these supplemental benefits. 19 U.S.C. 2296(c) (1976).

The 1981 amendment revised the worker training provisions in two respects that are relevant here. First, it added to the conditions that had to be met before the Secretary could approve worker training, requiring the Secretary to determine that:

(A) there is no suitable employment (which may include technical and professional employment) available for a worker,

(B) the worker would benefit from appropriate training,

(C) there is a reasonable expectation of employment following completion of such training,

(D) training approved by the Secretary is available to the worker from either governmental agencies or private sources (which may include area vocational education schools, as defined in section 2461(2) of title 20, and employers), and

(E) the worker is qualified to undertake and complete such training, . . . .

19 U.S.C. § 2296(a)(1) (1982). If these conditions were met, the statute provided (as it had before) that "the Secretary *may approve* such training." *Id.* (emphasis added). It continued (and this is the second major change): "Upon such approval, the worker shall be entitled to have payment of the costs of such training paid on his behalf by the Secretary." *Id.*

In his instructions regarding implementation of the 1981 amendments to the state employment security agencies ("SESAs") authorized to approve training on his behalf, 19 U.S.C. § 2311, the Secretary directed that training was to be approved only if, in addition to other requirements, "[s]ufficient funds allocated to pay the costs of such training are available. A State agency shall not approve training for a worker when funds to be expended for this purpose would exceed the amount allocated by the Secretary." Dept. of Labor, General Administration Letter No. 4–82 at 7 (Nov. 13, 1981). In other words, the SESAs were to operate on a "funds available" basis and were not to approve any training whose costs would exceed their fund allocations.

Congress did not enact an appropriations bill for the Department of Labor for fiscal year ("FY") 1982. As a result, the Department operated throughout the year under a series of four continuing resolutions.[1] The first of these—passed on October 1, 1981 and set to expire on November 20, 1981—contained a general funding provision at an annual level of approximately $3.7 billion for the Department's Employment and Training Administration ("ETA"), which administers the Trade Act program along with many other programs. Specifically, the Joint Resolution appropriated funds at the lower of the current rate or the appropriation foreseen in the Departments of Labor, Health and Human Services, and Education and Related Agencies Appropriation Act of 1982, which at that point had passed the House but not the Senate. *See* Act of Oct. 1, 1981, § 101(a)(1), (3), Pub.L. No. 97–51, 95 Stat. 958, 958–59 (1981). Since the 1982 Act, which provided an appropriation of $3.671 billion, was $3.472 billion below the 1981 appropriation, H.R. Rep. No. 251, 97th Cong., 1st Sess. 6 (1981), it was the governing referent. In full relevant part, the Appropriation Act provided as follows:

> For expenses necessary to carry into effect the Comprehensive Employment and Training Act of 1973, as amended, sections 236, 237, and 238 of the Trade Act of 1974, as amended (19 U.S.C. 2101), section 51 of the Internal Revenue Code of 1954, as amended (26 U.S.C. 51), sections 210, 211, and 212 of Public Law 95–250, and the Veterans' Employment and Readjustment Act of 1972, as amended (38 U.S.C. 2003A), including the purchase and hire of passenger motor vehicles, the construction, alteration, and repair of buildings and other facilities, and the purchase of real property for training centers as authorized by the Comprehensive Employment and Training Act of 1973, as amended, $3,671,129,000 plus reimbursements, of which $2,001,000 shall be for the National Commission for Em-

ployment Policy: *Provided,* That no funds from any other appropriation shall be used to provide meal services at or for Job Corps centers.

H.R. 4560, 97th Cong., 1st Sess. 2–3 (1981).

When FY 1982 opened, the Secretary decided to allocate no funds to Trade Act training out of the ETA account. The second continuing resolution, which merely extended the first resolution's expiration date from November 20 to December 15, 1981, provided no new directives. Act of Nov. 23, 1981, Pub.L. No. 97–85, 95 Stat. 1098 (1981). In the third continuing resolution, Congress expressly provided $25 million for the Trade Act program. Act of Dec. 15, 1981, Pub.L. No. 97–92, 95 Stat. 1183, 1185 (1981): "In addition to any sums otherwise appropriated there is appropriated an additional sum of $25,000,000 which shall be made available for training, job search allowances, and relocation allowances, under sections 236, 237, and 238 of the Trade Act of 1974."

The Secretary allocated this $25 million to Trade Act training, job search and relocation, but he allocated the entire original $3.7 billion ETA appropriation to other authorized programs. Congress made no further ETA or Trade Act appropriations for FY 1982; the fourth and final continuing resolution merely extended the third resolution from its expiration date (March 31, 1982) to the end of the fiscal year. Act of Mar. 31, 1982, Pub.L. No. 97–161, 96 Stat. 22 (1982). The Secretary maintained his Trade Act training allocation at $25 million and, through the SESAs, paid for training as many qualified applicants as that level of funding would permit.

Plaintiffs in this action were the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") and five individual union members. Four of these individuals had enrolled in training courses approved under the pre-amendment standards, and had incurred expenses attributable to those

---

1. Act of Oct. 1, 1981, Pub.L. No. 97–51, 95 Stat. 958 (1981); Act of Nov. 23, 1981, Pub.L. No. 97–85, 95 Stat. 1098 (1981); Act of Dec. 15, 1981, Pub.L. No. 97–92, 95 Stat. 1183 (1981); Act of Mar. 31, 1982, Pub.L. No. 97–161, 96 Stat. 22 (1982).

courses after October 1, 1981; they asserted that they were not reimbursed for those expenses. The fifth individual plaintiff alleged that she met the post-amendment criteria for training approval, and that her October 9, 1981 application for such approval was rejected by a SESA on the sole ground that no funds were available. The union sued on behalf of its members who were similarly situated to both categories of individual plaintiffs. The District Court correctly determined that at least one of the individual plaintiffs had standing to bring each of the complaints in this suit. We need not, therefore, consider whether the UAW had standing.[2] The complaint sought declaratory and injunctive relief for the Secretary of Labor's allegedly wrongful withholding of training benefits under the Trade Act by: (1) refusing to reimburse training costs incurred after October 1, 1981 by workers who had received approval for training under the old program before October 1, 1981; and (2) allocating an unreasonably small sum for the program.[3]

On cross-motions for summary judgment, the District Court entered judgment for the plaintiffs, finding for the Secretary on the first issue but against him on the second. It entered an order requiring the Secretary, through the SESAs, to conduct *de novo* approval determinations for (1) workers in previously approved training programs who incurred but were not reimbursed for training expenses after October 1, 1981, and (2) workers who applied for training approval after October 1, 1981, were denied approval on the basis of insuf-

ficient funds, and incurred unreimbursed training expenses. The approval was still to be on a "funds available" basis, but the District Court directed the Secretary to make the following funds available, out of amounts which had lapsed to the Treasury at the conclusion of FY 1981 from appropriations originally usable for Trade Act training purposes:[4] up to $85,120,000 for training reimbursements; up to $33,933,000 for extended benefits; up to $4,976,000 for SESA administrative expenses. We have before us the government's appeal and the plaintiffs' cross-appeal from the District Court's disposition.

## II

The District Court agreed with the plaintiffs on the question of funding level, holding that the Secretary acted unreasonably in allocating to Trade Act training only the $25 million additional appropriation made by the third continuing resolution. It was this holding that formed the basis for its order directing allocation of funds and approval determinations on the basis of availability of such funds.

The Secretary argues that his allocation "was a conscientious compliance with Congress' manifest intentions for the program in FY 1982." Appellant's Brief at 33. That may be so. The legislative history shows at least a congressional realization, if not a congressional intent, that nothing would be expended for Trade Act training out of the $3.7 billion lump-sum appropriation. On October 6, 1981, Representative

**2.** In *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Donovan,* 746 F.2d 839 (D.C.Cir. 1984), it was necessary to consider separately the standing of the union because its claim was arguably not subject to the defense which resulted in the judgment against the individual plaintiffs—*i.e.,* the joinder requirement derived from 19 U.S.C. § 2311(d) held applicable to individual claims for reopening of SESA denials of awards. (Such a defense was neither raised nor considered in the present appeal.)

**3.** The complaint also claimed that the Secretary wrongfully failed to pay extended TRA benefits

under the amended Act to workers who had continued to be enrolled after October 1, 1981 in training programs approved (under the former standards) prior to that date. That issue is no longer in the case. Similarly, appellees have not appealed the district court's rejection of their contention that it was unlawful for the Secretary to approve workers for training (through SESAs) only on a "funds available" basis.

**4.** The Secretary vigorously contests whether the designated funds were in fact usable for the specified purposes. In light of our disposition of the case this issue need not be resolved.

Donald Pease, a supporter of Trade Act training, proposed an unsuccessful amendment to earmark $20 million of the $3.7 billion for Trade Act training. In introducing it, he said:

> [T]he executive branch did not request any funding in fiscal year 1982 for employment training under the Trade Act until last Wednesday—the last day of the outgoing fiscal year. At that late date, the request for approximately $98.6 million could not be factored into the difficult task the Appropriations Committee performed in stretching far fewer training dollars to cover competing needs. Work had been completed on this bill [Labor-HHS appropriation bill] and it had even been scheduled for floor debate.

> Currently there are no funds provided in this bill (H.R. 4560) [Labor-HHS appropriation bill] for employment training in what remains of the trade adjustment assistance (TAA) program. We must act to insure that the Reagan administration follows through on its commitment to fund training for thousands of unemployed workers who have lost their jobs in America's basic industries.

> . . . .

> I realize that many public service employment and job programs are being cut back by 40, 50 percent, and even 60 percent. I share the concern of many of my colleagues about the devastating human impact of these cuts. But unless we act, the TAA training program will be cut out altogether.

127 CONG.REC. H7088–89 (daily ed. Oct. 6, 1981). During Senate debate on the second continuing resolution, efforts were made to add the $98 million requested by the President for Trade Act training. 127 CONG.REC. S13719–25 (daily ed. Nov. 19, 1981). Senator John Danforth, who proposed the amendment, stated:

> The administration's September budget request for the Employment and Training Administration in the Department of Labor specifically included ... $98.6 million ... for additional training, job search, and relocation assistance for TAA recipients.

> Unfortunately, the request arrived after the Labor Subcommittee had marked up the appropriation and was never considered by the committee. . . .

> Now we are faced with a situation where authorization exists for additional training, but the funds are not included in the continuing resolution.

> . . . .

> [W]e find that in the measure that is before us, in the reconciliation bill, the amount for retraining is not there. Therefore, the effect of not having it there is that ... in essence, we gut the whole thrust of the administration's program. So what is at stake is the program of the administration in trade adjustment assistance.

Id. at S13719–20. Senator Daniel P. Moynihan, who also supported the amendment, said: "Although this administration has requested $98.56 million for training, job search, and relocation assistance for workers in the trade adjustment assistance program, no such funds are included in this resolution." Id. at S13722. The amendment failed, id. at S13724–25, but a $50 million amendment was passed by the Senate later that same day. Even that did not survive in the final bill, see Act of Nov. 23, 1981, Pub.L. No. 97–85, 95 Stat. 1098 (1981), and it was not until the third continuing resolution that, as noted above, a $25 million earmarked appropriation was enacted.

This legislative history is relevant to our inquiry—but not directly relevant. As the Supreme Court has said (in a case involving precisely the issue of Executive compliance with appropriation laws, although the principle is one of general applicability): "legislative intention, without more, is not legislation." Train v. City of New York, 420 U.S. 35, 45, 95 S.Ct. 839, 845, 43 L.Ed.2d 1 (1975). The issue here is not how Congress expected or intended the Secretary to behave, but how it required him to behave, through the only means by which it can (as far as the courts are concerned, at least)

require anything—the enactment of legislation. Our focus, in other words, must be upon the text of the appropriation.

Lump-sum appropriations are a common feature of the legislative landscape, and we are not prepared to approach their interpretation by assuming that they are inherently ambiguous, capable of meaning either that no funds *need* be spent on any particular included program, or (as the Secretary seems to assert here) that no funds *could* be spent on a particular one, or that the funds *must* be distributed among all included programs in a given fashion—all as the committee reports and other entrails of legislative history might suggest. We think, to the contrary, that the lump-sum appropriation has a well understood meaning, and that the legislative history described above does not give content to an ambiguous enactment but rather reflects the congressional comprehension of a clear one. A lump-sum appropriation leaves it to the recipient agency (as a matter of law, at least) to distribute the funds among some or all of the permissible objects as it sees fit.[5]

There is ample support for this proposition apart from the legislative history of this specific appropriation. The General Accounting Office, whose "accumulated experience and expertise" in the field of government appropriations, *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1305 (D.C. Cir.1971), give special weight to its opinions, has consistently interpreted lump-sum appropriations as creating no requirement that the agency use the money for one project rather than another.

Congress has recognized that in most instances it is desirable to maintain executive flexibility to shift around funds within a particular lump-sum appropriation account so that agencies can make necessary adjustments for "unforeseen developments, changing requirements, ... and legislation enacted subsequent to appropriations." ... This is not to say that Congress does not expect that funds will be spent in accordance with budget estimates or in accordance with restrictions detailed in Committee reports. However, in order to preserve spending flexibility, it may choose not to impose these particular restrictions as a matter of law, but rather to leave it to the agencies to "keep faith" with the Congress....

On the other hand, when Congress does not intend to permit agency flexibility, but intends to impose a legally binding restriction on an agency's use of funds, it does so by means of explicit statutory language.

*LTV Aerospace Corp.*, B–183851, Oct. 1, 1975, 55 Comp.Gen. 307, 318, 75–2 CPD ¶ 203 (citation omitted). *See also* B–164031(3), Apr. 16, 1975; B–114833, July 21, 1978; B–202992, May 15, 1981. The same interpretation of the effect of a lump-sum appropriation appears in congressional statements—for example, the House Appropriations Committee's report on the 1974 Defense Department appropriation bill:

In a strictly legal sense, the Department of Defense could utilize the funds

---

**5.** An agency may, of course, be constrained to expend a certain portion of a lump-sum appropriation on a particular program because that program establishes a system of statutory entitlements over which the agency has no control. Such a constraint would arise not from the express or implied terms of the lump-sum appropriation itself but from the terms of the substantive statute for which the appropriation was usable. Even then, at least where the entitlement consists of the right to the payment of funds, it may be that the proper remedy is a suit under the Tucker Act, 28 U.S.C. § 1491 (1982), rather than a suit under the APA to compel executive expenditure. *See* 5 U.S.C. § 703

(1982); *cf. Barber v. United States*, 676 F.2d 651, 230 Ct.Cl. 287 (1982).

Appellees argued below that the Trade Act training program was an entitlement program— *i.e.*, that all those who met the five qualifications set forth in § 2296(a)(1) *had* to be approved for training. That argument has been abandoned on appeal, quite wisely in light of the statutory language. Apparently the Secretary has paid, out of the $3.7 billion lump-sum appropriation or otherwise, the entitlements to extended TRAs of workers approved for training under the old Act whose training and whose 26-week eligibility continued after October 1, 1981.

appropriated for whatever programs were included under the individual appropriation accounts, but the relationship with the Congress demands that the detailed justifications which are presented in support of budget requests be followed. To do otherwise would cause Congress to lose confidence in the requests made and probably result in reduced appropriations or line item appropriation bills.

H.R.Rep. No. 662, 93d Cong., 1st Sess. 16 (1973), *quoted in* United States General Accounting Office, Office of General Counsel, *Principles of Federal Appropriations Law* 2–27 (1982).

Appellees draw our attention to the following language in the third continuing resolution: *"In addition to any sums otherwise appropriated* there is appropriated an *additional* sum of $25,000,000 which shall be made available for training, job search allowances and relocation allowances."* Act of Dec. 15, 1981, § 101(a)(6), 95 Stat. 1183 (1981) (emphasis added). This, they say, clearly indicates Congress's understanding that allocation of funds for Trade Act training had already been mandated and that the $25 million merely supplemented the earlier appropriation. Of course it could indicate such an understanding; but it could just as well indicate that the $25 million specifically earmarked for training was not meant to *preclude* the *discretionary* expenditure of some of the $3.7 billion for that purpose. Since the latter interpretation rather than the former is consistent with the ordinary understanding of lump-sum appropriations, it must be preferred.

Appellees seek support for their position in the so-called impoundment cases, citing *Train v. City of New York, supra; City of Los Angeles v. Adams,* 556 F.2d 40 (D.C. Cir.1977); *Sioux Valley Empire Electric Association v. Butz,* 504 F.2d 168 (8th Cir. 1974); *State Highway Commission v.*

*Volpe,* 479 F.2d 1099 (8th Cir.1973); and *National Council of Community Mental Health Centers, Inc. v. Weinberger,* 361 F.Supp. 897 (D.D.C.1973). All of these cases, however, involved appropriated funds earmarked for the particular program that the Executive refused to implement or a program which required rather than merely authorized the Executive to confer statutory entitlements. *See* note 5, *supra.* The courts rejected, expressly or implicitly, the existence of "inherent constitutional power in the Executive to decline to spend in the face of a clear statutory intent and directive to do so." *National Council of Community Mental Health Centers, Inc. v. Weinberger, supra,* 361 F.Supp. at 901 (emphasis added). *See also Louisiana v. Weinberger,* 369 F.Supp. 856, 864 (E.D.La.1973). In the case before us, by contrast, *no* funds have been earmarked for the training program, and the Secretary is *not* required by the substantive statute to approve training for those who meet the conditions of § 2296(a)(1). The only "statutory intent and directive to spend" that can be found here is, at most, a directive to obligate *all* of the $3.7 billion to the ETA programs including $2,001,000 for the National Commission for Employment Policy. It is uncontested that such obligation occurred.[6]

Even if the congressional understanding of the meaning of lump-sum appropriations were not as clear as it is, we would reach the same result. To infer a "reasonable distribution" requirement as appellees would have us do, is to assume that Congress has conferred upon us a task for which we are eminently unsuited and, in all likelihood, constitutionally incompetent. The distribution of public funds among competing social programs is an archetypically political task, involving the application of value judgments and predictions to innumerable alternatives, as opposed to the application of accepted principles to a binary

---

**6.** As noted earlier, there is dispute as to whether the FY 1982 funds remitted to the Treasury which were the subject of the District Court's decree were ever available for Trade Act training purposes. It is uncontested, however, that

the fact of their remission was attributable not to the Secretary's failure to obligate them for specific programs, but to the programs' failure, by the end of the fiscal year, to exhaust the available funds.

determination. This reality is perhaps obscured in the present case by the fact that the District Court's decree pronounced appellees entitled to a quite specific and identifiable allotment: all the 1982 funds usable for training purposes that were remitted to the Treasury. But the court did not, because it could not, explain why it chose that figure instead of .237 as much—or even 2.37 as much, perhaps forcing other ETA programs to disgorge in later fiscal years some of the $3.7 billion they received in FY 1982. For all the plaintiffs *requested*—all they could *possibly* request, before the court as before the Department of Labor—was that the Secretary "spend a *reasonable portion* of [the $3.7 billion] to implement the program." Brief for Appellees at 35 (emphasis added). If Congress ever clearly places it in our responsibility to decree what "reasonable" amounts should be expended on various programs, there will be time enough to consider how and indeed whether such a task can be performed; but we will assuredly not run out to interpret lump-sum appropriations as constituting such a mandate.

■ Since, as the above discussion shows, the Secretary was not restricted by law—however much he may have been restricted by political practicality—in allocating the funds in this appropriation among the various programs it covered, we have no jurisdiction to review his determinations. The Administrative Procedure Act provides for judicial review "except to the extent that ... agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2) (1982). An action is committed to agency discretion so as to preclude judicial review "where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971), *quoting* S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945). That is precisely the situation here. The first Continuing Reso-

lution appropriates a lump sum of $3.7 billion to a variety of ETA programs. It carefully specifies that $2,001,000 of this shall be for the National Commission for Employment Policy but provides no direction as to how the remainder is to be distributed.

### III

■ Appellees contend in their cross-appeal that the District Court erred in requiring the Secretary (through the SESAs) merely to conduct *de novo* approval determinations (under the 1981 standards and with the total number of approvals presumably limited to the funds made available by the court's opinion) with regard to workers enrolled in approved programs on October 1, 1981. Appellees' position is that the pre-October 1981 approval—even though it was made pursuant to the more lenient standards of the unamended 1974 Act—should be deemed the requisite approval conferring entitlement, under the 1981 amendments, to both payment of extended TRAs (which the Secretary does not contest) and reimbursement of training expenses incurred after the effective date of those amendments. What we have said above renders the cross-appeal moot insofar as it seeks to entitle those workers in pre-October 1981 approved programs to a portion of the funds that the District Court made available. But the complaint asked more generally for a declaratory judgment that those workers are entitled to their post-October 1, 1981 expenses—from whatever funds they may be derived, including, presumably, funds appropriated for Tucker Act relief.[7] It remains necessary, therefore, to address this point.

The plain language of this statute cannot support appellees' interpretation. After reciting the new conditions for training approval, as set forth at page 857, *supra,* the relevant portion of the 1981 amendments provides that if those conditions are

---

7. Since some of the plaintiffs are individuals whose monetary claims will evidently not exceed $10,000, declaratory judgment as to them will not evade the statutory restriction upon

monetary relief in district courts. *See March v. United States,* 506 F.2d 1306, 1309 n. 1 (D.C.Cir. 1974). *Kester v. Campbell,* 652 F.2d 13, 15 (9th Cir.1981).

met "the Secretary may approve such training for the worker." It immediately continues: "Upon *such* approval, the worker shall be entitled to have payment of the costs of *such* training paid on his behalf by the Secretary." 19 U.S.C. § 2296(a)(1) (1982) (emphasis added). There is no way to avoid the interpretation that the qualifying approval ("such approval") is approval under the conditions of the 1981 amendments. Plaintiffs who received approval under the old, pre-October 1, 1981, version of the Trade Act did not receive "such" approval as is called for by § 2296(a)(1).

This conclusion is buttressed by the absence from the legislative history of the 1981 amendments of any indication of congressional intent to have prior approved trainees "grandfathered" into the new approval provisions. If that intent existed one would have expected to see it clearly expressed in the statute itself, but it is inconceivable that it would not at least have been reflected in the legislative history. It is not as though approval under the old criteria and approval under the new were essentially interchangeable. To the contrary, the new criteria required, as the old did not, an individualized determination that the worker seeking the training had the ability and interest to benefit from it.

Appellees argue, however, that if the Secretary concedes (as he has) that *extended benefits* are payable under the amended Act on the basis of pre-amendment training approval, he must logically concede that *training expenses* are automatically payable as well. We think not.

Both from the standpoint of the relevant statutory language and from the standpoint of the reasonably discernible congressional intent behind that language, the extended benefit issue and the expense reimbursement issue are quite distinct. The statutory text quoted three paragraphs earlier, containing the critical phrase "such approval," applies only to reimbursement of training expenses. The provision providing for the 26 additional weeks of TRAs, reads as follows:

[I]n accordance with regulations prescribed by the Secretary, payments may be made as trade readjustment allowances for up to 26 additional weeks in the 26-week period following the last week of entitlement to trade readjustment allowances otherwise payable under this part in order to assist the adversely affected worker to complete training *approved for the worker under section 2296 of this title....*

19 U.S.C. § 2293(a)(3) (1982) (emphasis added). The italicized portion refers to the section which, in the amended Act, contains the new approval requirements. That is also, however, the same section that authorized training approval (under the more lenient standards) in the prior version. *See* 19 U.S.C. § 2296(a) (1976). While we would not normally interpret the reference to include the section prior to its amendment, the language is at least susceptible of that interpretation. And the legislative history indicates this is precisely what was meant. The House Budget Committee report on OBRA clearly states: "For weeks of unemployment beginning after September 30, the worker would be entitled to the remaining number of weeks of basic TRA benefits and any additional weeks of benefits if in training the worker is entitled to *under the current program,* but at the new UI weekly benefit level." H.R.Rep. No. 158, 97th Cong., 1st Sess., Vol. III at 274 (1981) (emphasis added). There is thus good reason in statutory text and legislative history for treating training expenses and extended TRA benefits differently.

■ We conclude that the District Court was correct in refusing declaratory judgment that workers who secured approval under the old § 2296 have approved status for purposes of post-October 1, 1981 reimbursement.

\*    \*    \*    \*    \*    \*

For the reasons discussed, we vacate the order of the District Court and direct the entry of judgment for the defendant.

*So ordered.*