Kimberly Pokmi BARBER, a minor, By and Through her parent, Yong Cha BARBER, and Yong Cha Barber

v.

The UNITED STATES.

No. 132–80C.

United States Court of Claims.

Decided April 7, 1982.

---

**17.** *Id.*

**18.** *See HRH Constr. Corp. v. United States, supra* note 5, 192 Ct.Cl. at 918, 428 F.2d at 1271.

James C. Hagedorn, Sacramento, Cal., attorney of record, for plaintiffs.

Louis R. Davis, Washington, D. C., with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, and KUNZIG * and BENNETT, Judges.

BENNETT, Judge.

This military pay case is before the court on cross-motions for summary judgment by the parties. The question presented is whether the Air Force Board for the Correction of Military Records (the board) properly determined that plaintiffs were not entitled to recover survivors' annuity benefits under the Survivor Benefit Plan. 10 U.S.C. §§ 1447–1455 (1976 & Supps.). We have concluded that the board's determinations were erroneous and that plaintiffs are entitled to relief.

Plaintiffs Yong Cha Barber and Kimberly Pokmi Barber are the widow and surviving dependent child, respectively, of Air Force T. Sgt. Charles E. Barber, a career serviceman. The Barbers were married on July 26, 1972, in Seoul, South Korea, with Sergeant Barber formally adopting Yong Cha's daughter, Kimberly.

On March 10, 1976, prior to his retirement from the Air Force, Sergeant Barber was counseled on the facets of the Survivor Benefit Plan (the plan). Under the plan, the monthly retired pay of a participating retired serviceman is reduced by an amount determined prior to retirement and this sum goes to fund an annuity paid to the widow

* Judge Robert L. Kunzig died February 21, 1982. He heard oral argument in this case and agreed to the determination before his death.

and surviving dependent children upon the serviceman's death. Participation in the plan is automatic for servicemen who are married or have dependent children at the time they become eligible for retired pay, unless such servicemen elect not to participate in the plan before the first day for which they are eligible for retirement pay. 10 U.S.C. § 1448(a). Should a serviceman elect not to participate in the plan at the maximum level, his spouse is required by the statute to be notified of such election.[1] The regulation implementing the statute requires that the notification to the spouse be made in writing.[2] At the time of his counseling, Sergeant Barber executed a copy of Department of Defense form 1883 indicating that it was his desire to provide full plan coverage for his family.

On April 29, 1976, Sergeant Barber executed a second form 1883 electing not to participate at all in the plan. At that time, he submitted a letter of explanation stating his belief that participation in the plan with its attendant reduction in his monthly retired pay would impose a financial hardship on him and his family.[3]

On the following day, April 30, 1976, Sergeant Barber was released from active duty in the Air Force. He entered into retired status on May 1, 1976. Some 15 months later, on or about July 30, 1977, Sergeant Barber died from carbon monoxide poisoning.

When plaintiffs applied for survivor benefits under the plan, they were informed of Sergeant Barber's election out of the plan. On December 19, 1978, plaintiffs applied to the board seeking correction of Sergeant Barber's military records to reflect their entitlement to full survivor annuity benefits. Alleging that they had received no notification from the Air Force as to Sergeant Barber's decision, plaintiffs sought to void his election not to participate in the plan and to reinstate his original decision to provide full plan coverage.

The board denied plaintiffs' application for relief on November 14, 1979. This suit followed seeking reversal of the board's decision.

The gist of plaintiffs' position before this court is that Sergeant Barber's attempt to elect out of the Survivor Benefit Plan was improperly effected because they were never notified of his intentions. According to plaintiffs, since the plan provides for automatic coverage of the spouse and dependent children unless an election not to participate is made and since notice to the spouse of such an election is statutorily required, failure to give notice invalidates the election and restores full coverage under the plan. Plaintiffs cite the legislative history of the Survivor Benefit Plan to support this result.

The defendant counters by disputing the allegations made by plaintiffs that the Air Force violated the notice requirement of section 1448(a). Defendant further maintains that this court lacks jurisdiction in this matter because plaintiffs' claim sounds in tort and because plaintiffs have not predicated their claim on a statute which provides for a money judgment.

■ This court may only overturn a decision of a correction board when the decision is clearly unsupported by substantial evidence or when there is a noncompliance with applicable laws and regulations. *Jor-*

---

1. 10 U.S.C. § 1448(a) (1976) (amended 1978) provides in part: "If a person who is married elects not to participate in the Plan at the maximum level * * *, that person's spouse shall be notified of the decision."

2. Air Force Regulation 211–24, ¶ 7 (5 June 1975), provides:
   "When a member, with an eligible spouse, elects less than full participation and coverage under the plan, the PA counselor so advises the spouse in writing, using the letter format of attachment 1. Notification of the spouse when required is accomplished within 48 hours of the counseling session by regular mail for both CONUS and outside the CONUS addresses (see note to paragraph 6a). A copy of the letter should be filed with the member's DD Form 1883 by the PA counselor."

3. Sergeant Barber's retirement pay was $530.67 per month. Participation in the Survivor Benefit Plan would have reduced this amount approximately $24.40 to $506.27 per month.

*dan v. United States*, 205 Ct.Cl. 65, 72–73 (1974); *Ward v. United States*, 178 Ct.Cl. 210, 216–17 (1967). While plaintiffs' petition addresses these standards in only the most general fashion, we interpret the allegations therein to say that the board committed legal error in its interpretation of section 1448(a) as applied to this case. However, before considering whether reversal of the board's decision is warranted, we must first turn our attention to the threshold question of jurisdiction.

■ Our jurisdictional statute, 28 U.S.C. § 1491 (1976), has been construed to limit the scope of our review to suits in which a plaintiff seeks and can seek a money judgment. *Austin v. United States*, 206 Ct.Cl. 719, 723, *cert. denied*, 423 U.S. 911, 96 S.Ct. 215, 46 L.Ed.2d 140 (1975). In order to state a claim within the jurisdiction of this court, a plaintiff must assert a substantive right enforceable against the United States for money damages. *United States v. Testan*, 424 U.S. 392, 397–98, 96 S.Ct. 948, 952–53, 47 L.Ed.2d 114 (1976); *United States v. King*, 395 U.S. 1, 2–3, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969). In other words, the claimant must rely upon a particular statutory provision which grants, either expressly or by implication, "a right to be paid a certain sum." *Eastport S.S. Co. v. United States*, 178 Ct.Cl. 599, 605, 372 F.2d 1002, 1007 (1967).

■ Defendant challenges the present action on the ground that 10 U.S.C. § 1448(a), the statute relied upon by plaintiffs, does not command the payment of money to them under the circumstances alleged in their petition. Our review of the history and purpose of the Survivor Benefit Plan leads us to a different conclusion. We believe that a violation of section 1448(a) can be fairly said to give rise to a claim for money damages.

The articulated purpose of the Survivor Benefit Plan was to establish a system of survivor benefits for the survivors of military retirees.[4] This system was intended to correct an anomaly in the otherwise comprehensive military benefits program which left survivors of retired military personnel without any source of income if a retired serviceman died from nonservice-connected causes.[5] Under the statutory scheme, the rights of these survivors are protected through compulsory participation in the plan by each person entitled to retired pay, unless that person affirmatively chooses not to participate. Section 1448(a). The payment of a monthly annuity to the beneficiaries of each participant is provided for in section 1450. Quite clearly, failure to pay these monthly annuities would give rise to a claim in this court since the claimant would be suing for money improperly withheld; a cause of action arising from one of the two classes of claims encompassed by section 1491 of title 28 U.S.C. *Eastport S.S. Co.*, 178 Ct.Cl. at 605, 372 F.2d at 1007.

The circumstances of the present case do not alter this underlying entitlement to money. Plaintiffs argue that violation of the statutory notice requirement nullifies an election to withdraw from the plan. Should this position prevail, we would again be faced with a situation involving the right to be paid money. Thus, a claim for money damages is no less cognizable under the facts herein than in instances where coverage under the plan is undisputed. Upon proof of conditions, a claimant would be entitled to recovery in either situation. Granted, not all statutory violations give rise to a money claim. *Testan*, 424 U.S. at 401, 96 S.Ct. at 954. But in our view, these statutes do. In sum, we interpret sections 1448–1450 as creating a substantive right mandating compensation for damage sustained. *Eastport S.S. Co.*, 178 Ct.Cl. at 607, 372 F.2d at 1008–09.

Having decided that this matter is properly before us,[6] we next consider the deter-

---

4. S.Rep.No.92–1089, 92d Cong., 2d Sess. 2 (1972), *reprinted in* [1972] U.S.Code Cong. & Ad.News 3288, 3289.

5. 117 Cong.Rec. 37188–89 (1971) (remarks of Rep. Fish).

6. The other obstacle advanced to our taking jurisdiction over this suit involves defendant's

minations of the board. The board concluded that section 1448(a) only required notification of the spouse when a serviceman initially elected to decline plan coverage or elected to participate in the plan at less than the maximum level, and not where the serviceman, as here, initially participated in the plan and later revoked his election prior to retirement. Thus, according to the board, section 1448(a) was not applicable to plaintiffs' situation. This is clearly an erroneous interpretation of the statute and defendant has so conceded. However, defendant urges that we uphold the board's ultimate conclusion nonetheless, arguing that, while notice was required herein, if there was failure to give such notice it had no consequence on the decision to elect out of the plan. Thus, we must consider whether, as plaintiffs assert, the notice requirement of section 1448(a) is so inextricably related to a serviceman's option to withdraw from plan coverage that failure to provide such notice invalidates an election out of the plan. Failing this interpretation of the law, defendant urges that we find that notice was in fact given.

Section 1448(a), as in effect during the period in issue, read:

> The Plan applies to a person who is married or has a dependent child when he becomes entitled to retired or retainer pay unless he elects not to participate in the Plan before the first day for which he is eligible for that pay. If a person who is married elects not to participate in the Plan at the maximum level * * *, that person's spouse shall be notified of the decision.

It is obvious from this excerpt that the statute makes no mention of any intended relationship between a serviceman's option to elect out of the plan and the requirement that the spouse be notified of that election. Plaintiffs, however, ask us to read the above sentences conjunctively, thereby inferring a connection between notice and a proper election out. Defendant, mean-

while, maintains that a plain reading of the statutory language fails to support any theory of interdependency.

■ The starting point in any case involving statutory construction is the language itself. When confronted with a statute which is plain and unambiguous on its face, the court need not look beyond the language for guidance to its meaning. *Hart v. United States,* 218 Ct.Cl. 212, 225, 585 F.2d 1025, 1032 (1978). But as the positions of the parties demonstrate, and as our own reading of section 1448(a) finds, the congressional purpose for including this notice requirement is not clear merely from a reading of the statute.

■ Where, as here, the precise import of the statutory language is not readily apparent, it is appropriate to resort to the legislative history of the provision for guidance, even though the statute may be otherwise unambiguous. *Hart,* 218 Ct.Cl. at 225–26, 585 F.2d at 1031–32; *Selman v. United States,* 204 Ct.Cl. 675, 683, 498 F.2d 1354, 1358 (1974). " 'In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.' *United States v. Heirs of Boisdorée,* 49 U.S.C. 8 How. 113, 122, 12 L.Ed. 1009 (1849); * * *." *Philbrook v. Glodgett,* 421 U.S. 707, 713 (1975). As this court pointed out in *Otoe & Missouria Tribe v. United States,* 131 Ct.Cl. 593, 603, 131 F.Supp. 265, 272, *cert. denied,* 350 U.S. 848, 76 S.Ct. 82, 100 L.Ed. 755 (1955):

> One step in the discovery of legislative meaning or intent is the ascertainment of the legislative purpose, i.e., the reasons which prompted the enactment of the law. The purpose of the legislature may well tend to reveal the meaning of the language used by the lawmakers since we assume that the legislators sought to use language which would carry out their purpose rather than to defeat it. In seek-

---

assertion that plaintiffs' claim is tortious in nature. We can dispose of this argument summarily. Having previously decided that plaintiffs' cause of action is validated by sections 1448–1450, we have necessarily foreclosed its characterization as a claim sounding in tort. *Eastport S.S. Co. v. United States,* 178 Ct.Cl. 599, 614, 372 F.2d 1002, 1013 (1967).

ing to ascertain the legislative purpose, it is proper to look at the circumstances existing at the time of the enactment of the statute, to the necessity for the law, the evils intended to be cured by it, to the intended remedy, and to the law as it existed prior to such enactment.

The genesis of the Survivor Benefit Plan was legislation introduced during the 90th Congress.[7] This led to a comprehensive inquiry into the question of the adequacy of survivor benefit programs for the dependents of members of the Armed Forces, active and retired, during the following session of Congress. Extensive hearings were held in the summer of 1970[8] which focused, inter alia, on problems in the then-existing system with respect to the rights of widows of retired military personnel who died from nonservice-related causes. Under that system, because of a gap in coverage, widows of these retirees were not entitled to any share of the husband's retired pay he was receiving at the time of death.[9] In many instances such widows would be without any source of income until such time as their Social Security benefits, if any, became effective.

As a result of these hearings, H.R. 10670 was introduced in the House of Representatives by Representative Pike to establish a survivor benefit program for retired military personnel to supplement the survivorship benefits of Social Security and to provide for all career members of the Armed Forces an opportunity to leave a portion of their retired pay to their survivors at a reasonable cost.[10] Recognizing that military wives had a significant stake in any decision made at retirement concerning a survivor annuity, H.R. 10670 sought to elim-

inate prior inequities by making participation in the program automatic[11] and by providing for notice to the spouse in case of an election out of the program.

The committee report accompanying this legislation makes it very clear that Congress intended to prevent a serviceman's wife from learning for the first time that she was left without support at her husband's death, by providing her notice and participation in the counseling that was to precede a decision to elect out:

If a retiree who is married elects not to participate in the plan at the maximum level, the bill provides that person's spouse shall be notified. The Committee believes the program will receive overwhelming acceptance, such as has been experienced by the Civil Service survivor annuity system. However, the Committee is concerned that in a relatively few cases survivors may unknowingly be left in a situation of great hardship because a retiree, for one reason or another, did not join the program or otherwise provide an adequate annuity for his dependents.

It is the intention of the Committee, therefore, that regulations designed to carry out this provision of the bill provide for counseling by competent officers for those about to retire who elect not to participate or elect to participate at less than the maximum level. It is further the intention of the Committee that the spouse of the member concerned will be present at the counseling session if possible or provided separate counseling as necessary to be made fully aware of the options available and the election made by her husband. It is the intention of the Committee that in satisfaction of this re-

7. 117 Cong.Rec. 37194 (1971) (remarks of Rep. Pike introducing H.R. 10670).

8. *Inquiry into Survivor Benefits: Hearings Before the Select Subcomm. on Survivor Benefits of the House Comm. on Armed Services*, 91st Cong., 1st Sess. (1970).

9. 117 Cong.Rec. 37194 (1971) (remarks of Rep. Pike). *See also* S.Rep.No.92–1089, 92d Cong., 2d Sess. (1972), *reprinted in* [1972] U.S.Code Cong. & Ad.News 3288, 3294.

10. H.R.Rep.No.92–481, 92d Cong., 1st Sess. 1 (1971) (as submitted by Rep. Pike to accompany H.R. 10670).

11. H.R.Rep.No.92–481, 92d Cong., 1st Sess. at 8:

"Section 1448(a) of the bill provides that the program applies automatically to all future retirees at the time of retirement if they are married or have a dependent child or children unless they elect not to participate."

quirement counseling officers shall certify, in the event the retiree elects not to participate or to participate at less than the maximum level, that counseling has been provided and shall present the spouse with a statement that specifies she has been counseled and indicates the counseling officer's satisfaction that she fully understands the implications of her husband's election. The spouse should be invited to sign the statement indicating she has been counseled and understands the decision. The counseling officer should stand ready to provide any further information that the retiree or the spouse may require.

This new survivor annuity program makes a significant addition to the estate of the military retiree, and the Committee does not want a benefit of this magnitude lost to an individual service family through lack of awareness. It therefore wishes responsibility clearly placed on administrative officers to see that full counseling has been provided as to the effect on survivors of an election not to participate or to participate at a reduced level.

The rights in retirement pay accrue to the retiree and, ultimately, the decision is his as to whether or not to leave part of that retirement pay as an annuity to his survivors. However, the Committee wants every effort made to be sure that the advantage is not lost through neglect or lack of understanding and that the spouse fully understands the election may profoundly affect her future welfare. [H.R.Rep.No.92–481, 92d Cong., 1st Sess. at 8–9.]

On October 21, 1971, H.R. 10670 was passed by the House of Representatives and sent to the Senate. There, the House bill was passed in lieu of the principal Senate bill, S. 3905, after substituting for its lan-

guage the text of the Senate bill.[12] The House concurred in this amendment and the legislation was ultimately signed into law on September 21, 1972.[13] The language of both bills with respect to section 1448(a) was substantively the same.[14] While the Senate report does not contain statements like those in the House report as to the underlying purpose of the notice requirement, given the virtual identity of the provision in both bills and the absence of evidence of any contrary intent, we read the enacted statute as embodying a similar purpose.

■ Upon consideration of the legislative history of the Survivor Benefit Plan and after review of both committee reports, we are persuaded that Congress intended that an election out of the plan would not be binding unless the statutory notice requirement was satisfied. In creating the Survivor Benefit Plan, Congress was, in part, responding to the failure of the existing survivor protection system, the Retired Serviceman's Family Protection Plan, 10 U.S.C. §§ 1431–1446 (1976 & Supps.). Noting that under this purely voluntary system only 15 percent of the eligible military retirees had participated,[15] Congress, through the Survivor Benefit Plan, sought to sharply reduce or eliminate the possibility that a serviceman's dependents would inadvertently be left without any type of coverage, an all too frequent occurrence under the old system.

Congress used two means to accomplish its objective. First, the plan called for automatic coverage of dependents, requiring that any affirmative action with regard to the plan be action to elect not to participate. Secondly, Congress added the requirement of notice to the spouse. Recog-

**12.** 118 Cong.Rec. 29811 (1972).

**13.** Pub.L.No.92–425, § 1(3), 86 Stat. 706 (1972).

**14.** The House version of the Survivor Benefit Plan, H.R. 10670, provided:
"The Survivor Benefit Plan applies to every person who is married or has a dependent child when he becomes entitled to retired or retainer pay unless he elects not to participate in the

Plan before the first day for which he is eligible for that pay. If a person who is married elects not to participate in the Plan at the maximum level, that person's spouse shall be notified of the decision."

**15.** 117 Cong.Rec. 37194 (1971) (remarks of Rep. Pike).

nizing that, as a potential beneficiary, the spouse would be directly and adversely affected by any election out, Congress was concerned that the benefits of the program not be lost through neglect or misunderstanding. This concern is underscored by statements evidencing Congress' intention that the spouse be both notified and counseled in order that she be made fully aware of the implications of the husband's decision.[16] And it further was Congress' intention that this counseling take place before an election out of the plan was to be effective. This is confirmed by section 1455, the statute authorizing the President to prescribe regulations to implement the plan, which reads in pertinent part:

Those regulations shall—

(1) provide that, when the notification referred to in section 1448(a) of this title is required, the member and his spouse shall, before the date the member becomes entitled to retired or retainer pay, be informed of the elections available and the effects of such elections; * * *.

It is readily apparent from this provision that counseling was to be an integral part of the notice given to the spouse, and that it was to take place prior to the time when the serviceman became entitled to retired pay. It seems to us that the manifest design of this dual scheme of notice and counseling to apprise the spouse of the election and its impact on her future welfare was to give both parties the opportunity to discuss and reconsider together the decision to withdraw from the plan before retirement was effected. Inasmuch as any election out of the plan becomes irrevocable upon retirement under section 1448(a), the most rational reason for the notice requirement was to guarantee that the counseling Congress felt was necessary to protect the rights of the widow take place before that time. The importance of when such notification takes place is confirmed by the Air Force's own regulations which require that notification of the spouse take place within 48 hours of an election not to participate in the plan. AFR 211–24, ¶ 7. Unless these conditions

were met, there could be no assurance that the evils Congress feared would be avoided. Thus, we are convinced that notification of the spouse was necessary before a proper election out of the plan could be effected. That is to say an election had to be made from an informed position and with the spouse fully aware of the consequences.

A contrary interpretation of the statute would render the notice requirement, a significant portion thereof, superfluous or nugatory. This we cannot condone. *Aparacor, Inc. v. United States*, 215 Ct.Cl. 596, 605, 571 F.2d 552, 557 (1978); *Valley View Shopping Center Ltd. v. United States*, 210 Ct.Cl. 89, 95, 535 F.2d 42, 46 (1976). Notice was meant to safeguard the rights of the spouse and not merely as advice after the fact. Given the dramatic nature of the evil to be prevented, as illustrated by the present case, we cannot believe that Congress intended notice as an empty gesture. *United States v. American Trucking Ass'n*, 310 U.S. 534, 542–43, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940). While we acknowledge that not every statutory or regulatory violation will necessarily invalidate an election out of the plan, the legislative history of section 1448(a) indicates to us that such a result is compelled when the notice requirement is violated.

■ Finally, we address the question of whether or not notice was given to plaintiffs in the present case. By affidavit, plaintiffs contend that they received no notice of Sergeant Barber's decision to forego participation in the Survivor Benefit Plan. Defendant maintains that notice was given pursuant to section 1448(a) and, thus, no violation of that statute occurred. Initially, defendant supported its version of the facts with the affidavit of former S. Sgt. Duane A. Russell, executed on November 6, 1980. Therein, Russell stated that he had counseled Sergeant Barber concerning the plan and that after Sergeant Barber elected not to participate in the plan, he "then sent to Mrs. Barber a new letter advising her of her husband's new election." However, on

16. H.R.Rep.No.92–481, 92d Cong., 1st Sess. at 9.

January 15, 1981, Russell's deposition was taken by counsel for the parties. At that time, he admitted that, contrary to his affidavit, he did not have any specific recollection of actually sending notice to plaintiffs, but that it was his normal procedure to send such notice and he would have followed this normal procedure.

The board found plaintiffs' claims that they had not been notified that Sergeant Barber had changed his mind and declined participation to be neither persuasive nor convincing. The board's decision to deny plaintiffs' application was predicated on its conclusion that it had been presented with insufficient relevant evidence to demonstrate the existence of probable error or injustice. However, the board did not have the benefit of Russell's deposition in reaching this conclusion.

Defendant does not now dispute the content of this deposition,[17] but rather argues that in view of the lapse of time involved (over 4½ years) it is not remarkable that Russell would have no present recollection of having sent the notice. Asserting that it is just as likely that notice was sent as it is that it was not, defendant claims that at best a dispute exists as to this issue of fact, thereby rendering resolution of this matter by summary judgment inappropriate.

Ostensibly, we are faced with conflicting testimony from the parties as to whether or not notice was actually given. Since summary judgment cannot be granted where there exists a dispute as to a genuine issue of material fact, *Gernand v. United States*, 174 Ct.Cl. 936, 939 (1966), Ct.Cl. Rule 101(d), we must carefully examine the evidence presented in deciding plaintiffs' motion. In doing so, we consider the evidence in the light most favorable to the defendant. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

Plaintiffs categorically state by affidavit that they did not receive the required notice. Defendant's witness merely states that it was normal procedure to send such notice to the spouse after an election out of the plan. Taken as true, this statement does not controvert plaintiffs' affidavit. Summary judgment cannot be defeated by a general response to an affidavit. *Pacific Far East Line, Inc. v. United States*, 206 Ct.Cl. 378, 384–85, 513 F.2d 1355, 1358–59 (1975); *Royal Indemnity Co. v. United States*, 178 Ct.Cl. 46, 51, 371 F.2d 462, 465, *cert. denied*, 389 U.S. 833, 88 S.Ct. 33, 19 L.Ed.2d 93 (1967). Our Rule 101(f) requires specific facts showing that there is a genuine issue for trial. Defendant has not produced the specific facts necessary in this case. Instead, we are asked to take Russell's general statement and to infer therefrom the conclusion that notice was given. We find that this general statement alone is insufficient to create a true conflict of fact such as would forestall summary judgment.

Defendant's efforts to demonstrate an actual factual controversy are further weakened by Russell's admission that it was standard procedure to attach a copy of the letter sent to the spouse to the serviceman's form 1883 which was then filed with the Air Force Personal Affairs Office. Indeed, as we have shown, AFR 211–24, ¶ 7, says this should be done. Yet, at no time has defendant come forth with a copy of this letter.[18] In short, defendant has failed to produce sufficient evidence to raise a genuine issue of fact. Under these circumstances, we accept as true plaintiffs' allegation that defendant did not comply with the notice requirement of section 1448(a) and AFR 211–24.

As reflected by the preceding discussion, we find that the legislative history of the

---

17. Defendant made a motion to withdraw Russell's affidavit and to substitute in its place a copy of his deposition on April 15, 1981. This motion was allowed on May 4, 1981.

18. We also note that Russell testified that it was customary for the office copies of form 1883 and attachments to be destroyed no earlier than one year after filing, and that such forms filed in 1976 would not have been destroyed until at least the beginning of 1978. Accepting this statement as true, such form would still have been available in 1977 when, shortly after Sergeant Barber's death, plaintiffs contacted the Air Force about his personal affairs. Defendant has brought forth no evidence that the letter was shown to plaintiffs at that time.

Survivor Benefit Plan supports neither the board's nor defendant's interpretation of the relevant statutes and regulations. Moreover, we find substantial evidence to support the conclusion that plaintiffs were not given the notice required by law. We hold that plaintiffs are entitled to coverage under the Survivor Benefit Plan and to appropriate survivor benefits from the date of Sergeant Barber's death on July 30, 1977, until such time as they are no longer eligible therefor. We further hold that to the accrued total benefits to which plaintiffs are presently entitled there shall be offset that amount actually paid to Sergeant Barber during the period of his retirement that would otherwise have been deducted from his retirement pay as his contribution to the plan.

Accordingly, plaintiffs' motion for summary judgment is granted. Defendant's cross-motion for summary judgment is denied. Judgment is entered for plaintiffs and the case is remanded to the trial division for proceedings under Ct.Cl. Rule 131(c) for computation of damages.