**Patsy A. McFARLANE, Plaintiff,**

v.

**SECRETARY OF the AIR FORCE, Defendant.**

**Civ. A. No. 94 CV 692–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Nov. 16, 1994.

---

Guy J. Ferrante, King and Everhard, P.C., Falls Church, VA, for plaintiff.

Helen F. Fahey, U.S. Atty., Rachel C. Ballow, Asst. U.S. Atty., Alexandria, VA, and Major Carla S. Walgenbach, Office of the Judge Advocate Gen., Gen. Litigation Div., Arlington, VA, for defendant.

### MEMORANDUM OPINION

ELLIS, District Judge.

This is an appeal from a decision of the Air Force Board for Correction of Military Records ("the Board") denying as untimely Patsy McFarlane's application for correction of her late husband's military records. At issue is whether Ms. McFarlane's application was filed "within three years after [s]he discover[ed] the error or injustice" in the military record, as required by 10 U.S.C. § 1552(b).

### I.

Ms. McFarlane is the widow of Colonel Larimer C. McFarlane, a career Air Force officer who died in 1984. As a member of the armed services, Colonel McFarlane was eligible to participate in the Survivor Benefit Plan (the "Plan"), an annuity program designed to provide financial security for a servicemember's spouse after the member's death. *See* 10 U.S.C. §§ 1447–60. Participation in the Plan at the maximum level is automatic for a servicemember who is married or has dependent children at the time of retirement, unless before that time the member affirmatively elects to reduce the annuity payments or opt out of the Plan altogether. In the event a servicemember makes either of these elections, the spouse must be notified of the election and informed of its effects on his or her financial future. 10 U.S.C. §§ 1448(a)(6)(C), 1455.[1]

Prior to his retirement on January 1, 1976, Colonel McFarlane elected to reduce the amount of retired pay that he would contribute to the Plan. Specifically, he executed a Survivor Benefit Plan Election Certificate ("Election Certificate") on December 11, 1975 that changed the base annuity amount to be withdrawn from his monthly retired pay from the maximum level of approximately $1500.00 to the reduced amount of $300.00.[2] Yet, contrary to the Plan's requirements, the Air Force never notified Ms. McFarlane of her husband's reduced election.[3] And although Ms. McFarlane signed her name as a witness to her husband's signature on the Election Certificate, she

---

1. At the time of Colonel McFarlane's retirement, the Plan required spousal notification of the election and counseling regarding its effects. 10 U.S.C. §§ 1448(a)(3)(A), 1455 (1975). Under the current version of the Plan, the spouse must also consent to the election. 10 U.S.C. § 1448(a)(3)(A) (1992).

2. Although Plan elections become irrevocable upon retirement, 10 U.S.C. § 1448(a)(4), Congress created an open enrollment period between October 1, 1981 and September 30, 1982 that allowed military retirees who were participating in the Plan at less than the maximum level to increase the amount of the annuity. Pub.L. No. 97–35, 95 Stat. 383 (Aug. 13, 1981), *as amended by* Pub.L. No. 97–252, 96 Stat. 753 (Sept. 8, 1982). Importantly, an increased election would become effective only if the retiree lived at least

two years after making the new election. Colonel McFarlane took advantage of this opportunity on September 8, 1982 by executing a form to increase the base amount of the spousal annuity to $1,500.00. This never became effective because Colonel McFarlane did not survive the requisite two years. The record is devoid of any evidence regarding whether Ms. McFarlane participated in or was aware of her husband's 1982 decision to attempt to increase the annuity election.

3. Although the Board does not explicitly concede this point, the Air Force has no evidence that notice was given or that counselling occurred. By contrast, Ms. McFarlane has affirmatively stated under oath that she was neither notified nor counseled regarding her husband's election of reduced benefits under the Plan.

stated in support of her application to the Board that "[a]t the time of my husband's retirement, I had no knowledge of the Survivor Benefit Plan or what he was doing in that regard." (P. McFarlane Decl., Admin.R. at 25). Precisely when Ms. McFarlane actually discovered that she was receiving less than the maximum annuity payment is unclear from the record. What is clear is that Ms. McFarlane did not learn of the Air Force's obligation to have notified her of the election until 1990, when an informal meeting with other armed forces widows brought the notification requirement to her attention. Shortly thereafter, in June 1991, she submitted to the Board an application to correct her husband's reduced annuity election. Arguing that the reduced annuity payments were in error given the lack of spousal notification and counseling, Ms. McFarlane requested that her husband's records be changed to reflect participation in the Plan at the maximum level.[4] The Board rejected the application, contending that it "was not filed within three years after the alleged error or injustice was discovered, or reasonably could have been discovered, as required by [10 U.S.C. § 1552]." (Admin.R. at 13). Ms. McFarlane now appeals this decision, contending that her application was timely since she did not actually discover the error until 1990, when she first learned of the Air Force's obligation to have notified her of her husband's reduced annuity election. The Board counters that Ms. McFarlane discovered the error, or reasonably should have discovered the error, back in 1975, when she witnessed her husband's signature to the Election Certificate, or, at the latest, in 1984, when she began receiving the reduced annuity payments. On these opposing grounds, both parties have moved for summary judgment.

## II.

■ Analysis properly begins with a statement of the appropriate standard of review. This case is governed by the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701–06. Under the APA, courts may overturn the Board's decision only if it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. § 706(2)(A). *See also, Voge v. Secretary of the Navy,* No. 93–2346, slip op. at 3, 1994 WL 474837, at *1, 1994 U.S.App. LEXIS 23956, at *3 (4th Cir. Sept. 2, 1994) (unpublished); *Mickens v. United States,* 760 F.2d 539, 541 (4th Cir. 1985) (also may overturn Board decision if not supported by "substantial evidence"), *cert. denied,* 474 U.S. 1104, 106 S.Ct. 889, 88 L.Ed.2d 923 (1986). The question presented, then, is whether the Board's denial of Ms. McFarlane's correction application as untimely was arbitrary, capricious, or contrary to law.

## III.

■ At the outset, it is worth noting that the Air Force's failure to notify and counsel Ms. McFarlane regarding her husband's Plan election nullifies the election and gives rise to a claim for reinstatement of maximum annuity benefits. In a string of cases involving service widows who were not notified of their husbands' elections to opt out of the Plan, the Court of Claims and its successor, the Federal Circuit, have held that such an election is not binding on the surviving spouse unless the statutory notice requirement was satisfied. *See, e.g., Barber v. United States,* 230 Ct.Cl. 287, 676 F.2d 651, 657 (1982); *Trone v. United States,* 230 Ct. Cl. 904, 1982 WL 25268 (1982); *Kelly v. United States,* 826 F.2d 1049 (Fed.Cir.1987). *See also, Dean v. United States,* 10 Cl.Ct. 563 (1986).[5] This sound conclusion gives sub-

---

4. Ms. McFarlane currently receives a monthly annuity of $351.00 under the Plan. Correction of her husband's records to reflect the maximum level of participation would increase her Plan benefits to $1530.00 per month. (Admin.R. at 40). If Ms. McFarlane is ultimately successful in her claim, she will be required to reimburse the Air Force for the excess amount that would have been withheld from Colonel McFarlane's retired pay had he elected the maximum level of partic-

ipation in the Plan. This amount does not appear in the administrative record.

5. Courts, in reaching this conclusion, noted that Congress' purpose in enacting the spousal notification provisions of §§ 1448 and 1455 was to ensure that surviving military spouses were not "unknowingly [ ] left in a situation of great hardship because a retiree, for one reason or another, did not join the program or otherwise provide an adequate annuity for his dependents." H.R.Rep.

stance to the notification and counseling requirements, which otherwise might be effectively ignored. Thus, the Air Force acted contrary to law when it accepted and gave effect to Colonel McFarlane's Election Certificate without having notified Ms. McFarlane of the election or counseled her regarding its effects. Had Ms. McFarlane known of her husband's election and had she been apprised of its consequences, she would have had the opportunity to confer with her husband and possibly influence this important decision. And even had Colonel McFarlane decided nonetheless to limit his participation in the Plan, Ms. McFarlane would then have had the opportunity to plan for her financial future in light of the election. By failing to provide Ms. McFarlane with notification and counseling, the Air Force violated a clear statutory mandate, thereby invalidating Colonel McFarlane's reduced annuity election.[6] Thus, if her application for correction of her husband's military records is timely, Ms. McFarlane would be entitled to reinstatement of the annuity payments at the maximum rate.

No. 481, 92d Cong., 1st Sess., at 8–9, *quoted in Barber,* 676 F.2d at 656. Accordingly, as the Court of Claims has noted, the purpose of the notification and counseling requirements is to "give both parties the opportunity to discuss and reconsider together the decision to withdraw from the plan before retirement [is] effected." *Barber,* 676 F.2d at 658.

6. The Board argues that if Ms. McFarlane had *actual* notice from any source of her husband's reduced election before the time of his retirement, the Air Force's breach of its statutory duty would be harmless. Not so, for even if Colonel McFarlane had told Ms. McFarlane of the reduced election, thereby giving her actual notice, the Air Force would not be relieved of its duty to notify and counsel her regarding the consequences of the election. In enacting the notification provisions, Congress not only sought to ensure that the spouse received notice of a reduced election but also "wishe[d] responsibility clearly placed on administrative officers to see that *full counseling* ha[d] been provided as to the effect on survivors" of the reduced election. H.R.Rep. No. 481, 92d Cong., 1st Sess., at 8–9, *quoted in Barber,* 676 F.2d at 657 (emphasis added). It is important to note, then, that even if Ms. McFarlane had received actual notice from any source before the time of her husband's retirement, she would have had a claim for reinstatement of benefits owing to the absence of counseling by the Air Force. In that event, however, her claim would now be time barred. *See infra* part IV.

## IV.

The pivotal issue, therefore, is the timeliness of Ms. McFarlane's application. With respect to applications for correction of military records, Congress has provided that "[t]he Secretary of a military department may correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1).[7] And Congress has also made clear that ordinarily, "[n]o correction may be made ... unless the claimant or his heir or legal representative files a request for the correction within three years after he discovers the error or injustice." § 1552(b). Thus, an applicant for correction of military records whose request is not made within this three year period loses the right to have the substance of his or her claim resolved. But all is not lost if an application is untimely, for the Board still "may excuse a failure to file within three years after discovery if it finds it to be in the interest of justice." § 1552(b).[8]

7. This provision goes on to state that, with limited exceptions, "such corrections shall be made by the Secretary acting through boards of civilians of the executive part of that military department." § 1552(a)(1). The Air Force Board for Correction of Military Records is such a board.

8. The administrative record reflects that, in rejecting Ms. McFarlane's application as untimely, the Board also determined that in its view, excusing the untimely filing would not be in the interest of justice. The Board now argues that the Court lacks jurisdiction to review its decision not to excuse an untimely filing. Specifically, it claims that since the words "in the interest of justice" do not provide a meaningful standard for review, "agency action [has been] committed to agency discretion by law," thereby rendering judicial review unavailable. 5 U.S.C. §§ 701(a), 702. *See also, Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985). In this regard, it is worth noting that several courts that have considered this issue agree with the Board's position. *See Ortiz v. Secretary of Defense,* 842 F.Supp. 7 (D.D.C.1993); *Ballenger v. Marsh,* 708 F.2d 349 (8th Cir.1983); *Kendall v. Army Bd. for Correction of Military Records,* 996 F.2d 362 (D.C.Cir.1993). The contrary view, which also claims judicial support, is more compelling. Thus, on its face, § 1552(b) does not preclude judicial review. Nor is meaningful review precluded, since courts can review the agency's decision under the familiar "abuse

■ This statutory scheme, applied to the instant case, means that Ms. McFarlane's application to the Board was timely only if she filed it within three years of when she first discovered the "error or injustice." And the "error or injustice" she seeks to correct is the Air Force's enforcement of Colonel McFarlane's reduced annuity election without having first notified Ms. McFarlane of the reduction and counseled her regarding its effects on her financial future. Thus, Ms. McFarlane discovered the "error or injustice" whenever she first learned that the annuity she was receiving was less than the maximum survivor annuity.[9] At that time, she would be in possession of all the facts constituting the "error or injustice" in her husband's military record. Because the administrative record does not disclose precisely when Ms. McFarlane learned for the first time that she was receiving, or would receive, less than the maximum survivor benefits, the Board on remand must conduct further factual inquiry to determine whether the application is timely.

### V.

Seeking to avoid this result, the Board contends that the proper inquiry for time bar purposes is when the alleged error or injustice was discovered, *or reasonably could have been discovered.* (Admin.R. at 13). Under this standard, the Board argues, Ms. McFarlane either actually discovered or reasonably could have discovered the error or injustice at the time of Colonel McFarlane's retirement on January 1, 1976, since she had previously witnessed her husband's signature on the Election Certificate. The Board evidently found persuasive its advisory opin-ion's[10] statement that "[it] is not reasonable to conclude [Ms. McFarlane] was unaware of the actual election or its possible ramifications" since "[she] signed the decedent's election form as a witness." (Admin.R. at 28).

■ This argument fails for two reasons. First, the Board erred in importing a reasonableness standard into the date of discovery of the error or injustice. The Supreme Court has made clear that "[t]he plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.' " *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (quoting *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)). Section 1552(b) permits correction of a military record if an application is made "within three years after [the applicant] discovers the error or injustice." The plain language of this statutory provision indicates that the limitations period begins to run upon the applicant's *actual* discovery of the error or injustice. Nowhere does the statutory language suggest that the date of discovery should turn on when a *reasonable* person, rather than the applicant herself, would have found the mistake. Nor is this one of those "rare cases" where application of the literal terms of the statute would "produce a result demonstrably at odds" with Congressional intent. The Board has pointed to no evidence in the statute or its legislative history to suggest that Congress meant anything other than what it said. Therefore, it was contrary to law for the Board to import a

of discretion" standard. *Cf. Townsend v. Secretary of the Air Force,* No. 90–1168, slip op. at 2, 1991 WL 232063 at *2 (4th Cir. Nov. 12, 1991) (unpublished); *Mullen v. United States,* 19 Cl.Ct. 550 (1990); *Allen v. Card,* 799 F.Supp. 158 (D.D.C.1992). In any event, the disposition of this matter by remand renders it unnecessary to reach this issue.

9. Conceivably, Ms. McFarlane might have learned that she would be receiving less than full survivor benefits before January 1, 1976, the date of Colonel McFarlane's retirement. In that event, she would be deemed to have discovered the error or injustice on the date of her hus-band's retirement. That date was the date the election became effective and hence the Air Force's deadline for providing notice and counseling. Before that date, there would have been no error or injustice in effect for Ms. McFarlane to discover.

10. To aid in its resolution of Ms. McFarlane's application, and pursuant to 32 C.F.R. § 865.27(b) (1994), the Board requested and received an advisory opinion from the Retiree Activities Branch of the Headquarters Air Force Military Personnel Center. The advisory opinion recommended denial of Ms. McFarlane's application.

"reasonable person" test into § 1552(b),[11] and the statute of limitations on Ms. McFarlane's claim runs only from the time that she actually discovered that she was receiving a reduced annuity.[12]

 The second flaw in the Board's argument appears in its claim that Ms. McFarlane's signature as a witness on the Election Certificate demonstrates that she was actually aware of the reduced election before her husband retired. A "witness" to a document is defined as "[a] person attesting the genuineness of [a] signature to [a] document by adding his signature." BLACK'S LAW DICTIONARY 1604 (6th ed. 1990). Similarly, a "subscribing witness" is someone who "witnesses or attests the signature of a party to an instrument, and in testimony thereof subscribes his own name to the document." BLACK'S LAW DICTIONARY at 1427. As these definitions make clear, the role of a witness to a document is to verify that the person executing the document is indeed the person he or she purports to be. To accomplish this, the witness need not read the document nor familiarize himself with its contents or subject matter. See 79 Am.Jur.2d Wills § 274 (1975) (stating that "[i]t is not essential to the validity of a will that it be read over to the witnesses thereto, or that they know its contents" and noting that where publication is not required, witnesses need not even know the document they are signing is a will). Thus, the fact that Ms. McFarlane signed her name as a witness on the Election Certificate does not establish that she knew or understood that Colonel McFarlane was electing to reduce her survivor annuity benefits, and it was error for the Board to so conclude.[13] This is especially true given Ms. McFarlane's unrebutted declaration that at the time of her husband's retirement, she was unfamiliar with the Plan and was unaware of her husband's actions or elections in that regard. (P. McFarlane Decl., Admin.R. at 25).

 The Board next contends that, as a matter of law, Ms. McFarlane must have known of the reduction in annuity benefits when she began to receive them in 1984. In so arguing, the Board relies principally upon *Dean v. United States*, 10 Cl.Ct. 563, 568–69 (1986), *Hart v. United States*, 910 F.2d 815, 818 (Fed.Cir.1990), and *Warren v. United States*, 4 Cl.Ct. 552, 556, *aff'd*, 746 F.2d 1489

---

11. In support of its position, the Board cites several cases involving other statutes of limitations in which courts have looked to when a reasonable person would have known of an injury or breach of duty. *See, e.g., United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979); *Portis v. United States*, 483 F.2d 670 (4th Cir.1973). These cases are not analogous, for they involve interpreting statutes of limitations that run from the date that a cause of action accrues, not the date that an individual discovers an error or injustice. The Board also cites for support *Kendall v. Army Bd. for Correction of Military Records*, 996 F.2d 362, 364–65 (D.C.Cir.1993) and *Evans v. Marsh*, 835 F.2d 609, 611 (5th Cir.1988), cases in which the Board had earlier determined that the error or injustice "was, or with reasonable diligence should have been, discovered" more than three years before. The Board's reliance on these cases is misplaced, for in neither case was the issue squarely presented or decided. In both cases, the panel opinion does nothing more than recount the Board's use of the standard in the recitation of facts.

12. Although the relevant inquiry is what *Ms. McFarlane* knew and when she knew it, the Board may have to consider what a reasonable person would have known in order to establish what Ms. McFarlane herself knew. That is, if the evidence shows that Ms. McFarlane was not

aware that she was receiving a reduced survivor annuity until 1991, the three year limitations period would not begin to run until that date, however unreasonable her earlier lack of knowledge may have been. But if direct evidence of Ms. McFarlane's knowledge is inconclusive, then the best evidence of what and when Ms. McFarlane knew may well be circumstantial, that is, what reasonable people in her situation would have known. *See, e.g., United States v. Jones*, 797 F.2d 184, 187 (4th Cir.1986) (government may rely on circumstantial evidence to prove knowledge).

13. This conclusion comports with common experience and elemental fairness. It is common experience for persons to witness their spouse's signature on documents, and it is equally common for these witnesses not to read or know the contents of the documents apart from the spouse's signature. And this is appropriate in light of the common understanding that a witness' function is limited to validating a signature. Witnesses are not on notice that they must read or familiarize themselves with the contents of the documents. Given this, it would be unfair to charge a person with knowledge of a document when his or her sole function was to witness a signature.

(Fed.Cir.1984), cases in which courts concluded that the applicant for survivor benefits' claim arose, at the latest, at the time of the servicemember's death. These cases are distinguishable and do not control the disposition of the instant case. In *Hart*[14] and *Warren*,[15] the courts applied a six year statute of limitations that ran not from the date that the individual discovered an error or injustice, but from the date that the cause of action accrued. The cause of action accrued when benefits were erroneously denied (*i.e.*, at the time of the retiree's death), not when the plaintiff discovered the error. And although the court in *Dean* applied the same statute of limitations that is at issue in the instant case, the plaintiff's spouse in *Dean* had elected out of the Plan altogether. Thus, it was logical for the court to conclude that the plaintiff there had discovered the erroneous reduction in benefits when, after her husband's death, she received no benefits at all. By contrast, Ms. McFarlane began receiving monthly annuity payments, albeit at a reduced rate, shortly after Colonel McFarlane died. Unlike the plaintiff in *Dean*, therefore, it is certainly possible that Ms. McFarlane believed she was receiving the maximum amount of annuity benefits. Thus, the date of Colonel McFarlane's death is not automatically the date of discovery in this case.

## VI.

Ms. McFarlane's position is also at odds with the conclusion reached here. She contends that the "error or injustice" was the Air Force's failure to notify and counsel her regarding the reduced election, a failure she insists she could not have discovered until she learned of the Air Force's legal duty to do so. In her view, it is irrelevant when she first learned that her husband reduced her survivor annuity benefits because she could not have known that the reduction was erroneous or unjust until she knew that the Air Force had a duty to notify and counsel her prior to enforcing the election. Under this reasoning, the three year limitations period on her application would not have commenced until 1990, when she first learned of the statutory notice and counseling requirements.

■■■ This argument confuses discovery of an error or injustice with discovery of one's legal rights and remedies. Put another way, Ms. McFarlane knew all of the facts constituting the error or injustice whenever she learned that she was receiving reduced annuity benefits without prior notice or counseling, even though she may not yet have known that those facts gave rise to a legal claim. While the § 1552(b) clock does not begin to tick until the individual discovers the error or injustice, its ticking does not await the individual's discovery of the law. *See Dean*, 10 Cl.Ct. at 569 (stating that the applicant "was bound to know the statutory requirements surrounding the Survivor Benefit Plan and to take appropriate action to ascertain whether they had been satisfied").[16]

---

14. In *Hart*, the plaintiff did not apply for correction of her husband's military records through the Board, but rather sued the government directly for the annuity in the Court of Claims. Thus, the three year statute of limitations in § 1552(b), running from "discovery of the error or injustice," was not applied. Rather, the court relied upon the six year statute of limitations under the Tucker Act, 28 U.S.C. § 1491, running from accrual of the cause of action. *Hart*, 910 F.2d at 817.

15. *Warren* is entirely inapposite, as it does not involve a claim for survivor annuity benefits under the Plan. Rather, the plaintiff in *Warren* sought annuity benefits from the United States Post Office, where the deceased had worked, based upon the claim that the deceased had been mentally incompetent to apply for the requested benefits. 4 Cl.Ct. at 555.

16. *Cf. Richards v. Fairfax County School Bd.*, 798 F.Supp. 338 (E.D.Va.1992) ("[i]gnorance of the legal right to sue does not generally prevent the limitations period from running"), *aff'd*, 7 F.3d 225 (4th Cir.1993); *Harbor Ins. Co. v. Urban Constr. Co.*, 990 F.2d 195, 201 n. 7 (stating that in Texas, "the statute of limitations for reformation [of contract] begins to run from the actual discovery of the error or omission. Accrual of the cause of action 'does not await the plaintiff's recognition that he has grounds for a lawsuit.' ") (citing *Arabian Shield Dev. Co. v. Hunt*, 808 S.W.2d 577, 583 (Tex.Ct.App.1991)); *Sexton v. United States*, 832 F.2d 629 (D.C.Cir.1987) (even when government's negligence stemmed from failure to act, plaintiff "need only undertake a reasonably diligent investigation to determine whether a cause of action may lie").

Ms. McFarlane is correct to point out that unlike many statutes of limitations, § 1552(b) turns on discovery of an error or injustice, not accrual of a cause of action. Yet, this observation does not end the matter, for it seems equally clear that the relevant "discovery" is the applicant's discovery of the facts underlying her claim, not her discovery of the law.[17] Nothing in § 1552(b) suggests otherwise.

## VII.

In summary, the Air Force committed legal error in failing to notify and counsel Ms. McFarlane regarding her husband's limited participation in the Plan. As a result, Colonel McFarlane's reduced election must be voided if Ms. McFarlane's application for the correction is timely. Whether Ms. McFarlane's application is timely depends upon the date on which she first learned that she was receiving reduced annuity benefits under the Plan, which date does not clearly appear in the current record. Therefore, this matter is **REMANDED** to the Board to conduct whatever further factual inquiry may be appropriate to determine when Ms. McFarlane first learned she was receiving a reduced annuity. Should the Board find the application to be untimely, it is further directed to determine whether the untimeliness should be excused "in the interest of justice."[18]

---

17. It is worth noting that there is a clear distinction between the "injustice," the discovery of which commences the three year limitations period under § 1552(b), and the "interest of justice" standard to be used by the Board in determining whether to excuse an untimely filing under § 1552(b). While the former refers to something found in the military record that is said to be unjust, the latter is the standard that governs the Board's discretion to excuse late applications. Among the matters relevant to the application of this standard are the circumstances surrounding the applicant's untimely filing. This noted, the Court expresses no opinion on any aspect of this issue, including whether an appli-cant's ignorance of the military's legal obligations toward her would support excusing the untimely filing "in the interest of justice."

18. Although the Board previously determined that excusing the untimeliness of Ms. McFarlane's application would not be "in the interest of justice," that determination was based at least in part on erroneous considerations, such as the legal effect of witnessing a signature to a document. As a result, if on remand the application is determined to be untimely, the Board should reconsider whether to excuse the untimeliness "in the interest of justice."